**Joseph L. JONES, Petitioner,**

**and**

**Keith D. Snyder, Petitioner,**

v.

**Edward J. DERWINSKI, Secretary of Veterans Affairs, Respondent.**

**No. 90–649.**

United States Court of Veterans Appeals.

Argued Sept. 10, 1991.

Decided Nov. 27, 1991.

Keith D. Snyder, Washington, D.C., for appellant Joseph L. Jones.

William G. Smith, Los Angeles, Cal., as amicus curiae.

Robert E. Coy, Acting Gen. Counsel and Barry M. Tapp, Asst. Gen. Counsel, Washington, D.C., for appellee.

Before FARLEY, MANKIN and STEINBERG, Associate Judges.

FARLEY, Associate Judge, filed the opinion of the Court. MANKIN and STEINBERG, Associate Judges, concurring, filed separate opinions.

FARLEY, Associate Judge:

Petitioners, Joseph L. Jones and his attorney, Keith D. Snyder, are once again before the Court seeking extraordinary relief and sanctions because of unauthorized and erroneous communication from a Regional Office of the Department of Veterans Affairs. On June 6, 1991, this Court denied their original petition for similar relief, taking care to explain that we were denying the petition in reliance upon statements made by the representative of the Secretary that corrective measures had already been taken and based upon our "trust that if additional steps need to be taken to prevent unauthorized and erroneous communications with represented clients the Secretary will take them". *Nagler/Jones v. Derwinski*, 1 Vet.App. 297, 306 (1991). From this second petition, it now appears that both our reliance and our trust were misplaced and that petitioners are entitled to relief.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On March 27, 1991, this Court consolidated for oral argument petitions for extraordinary relief and sanctions in two separate cases. In each, petitioners alleged that there had been unauthorized and erroneous communications from components of the Department of Veterans Affairs (VA) with claimants represented by attorneys concerning the substance of the representation being provided and the nature of any fee agreements. In one of the consolidated cases, *Nagler v. Derwinski*, 1 Vet.App. 297, petitioner specifically alleged that a Regional Office (RO) had sent a letter to a represented claimant which contained outdated and wrong information and which impaired the attorney-client relationship, *inter alia*, by implying that the fee agreement could result in the criminal conviction of the attorney. The Court found that there was indeed a factual predicate for these allegations.

The files of this Court contain unrebutted evidence that Regional Offices, on their own, not only have communicated directly with represented claimants in connection with fee agreements but have made statements which were outdated, wrong as a matter of law, and which, by their nature, could only have impacted adversely upon the relationship of the attorney-petitioners with their clients.... [T]he Secretary does not deny that erroneous information was communicated directly to claimants known to be represented but dismisses the communication—as did the BVA rather grudgingly, without any expression of regret, and without the demanded clarification—as inadvertent and not harmful. In our view, the Secretary's cavalier approach evidences a profound misunderstanding of the seriousness of this matter.

*Nagler/Jones*, at 305. The Court continued:

It is difficult to conceive of a communication which a government agency could issue to an attorney's client which would be more injurious to a professional relationship. It is even more difficult to conceive of a reason why the RO should communicate with an attorney or a client concerning the terms of a fee agreement. The Secretary has not cited, and we have not found, any statutory authority for the review of fee agreements by Regional Offices or for any communication from Regional Offices with attorneys or their clients in connection with the terms of fee agreements.

*Id.* at 306.

Although the Court refrained from issuing an extraordinary writ or imposing sanc-

tions, it clearly indicated that its restraint was motivated by its reliance upon statements made during oral argument by the Secretary's representative who "advised that the new Chairman of the Board of Veterans' Appeals had attempted to remedy the problem by reminding all of the Regional Offices and, presumably his own staff, that obsolete forms, and obsolete legal advice must not be communicated". *Id.* at 306. The Court also presumed that the Secretary would act to prevent the "repetition of this egregious unprofessional conduct" (*id.* at 306):

> Although the Chairman of the BVA may not have statutory or regulatory power to dictate policy to the Regional Offices, just as we trust that the Board will refrain from the premature and unauthorized review of fee agreements, we also trust that if additional steps need to be taken to prevent unauthorized and erroneous communications with represented clients the Secretary will take them. Under these circumstances, following the example of *Erspamer* [*v. Derwinski*, U.S.Vet.App. No. 89–14 [1 Vet. App. 3] (Feb. 23, 1990), *appeal dismissed per agreement of the parties*, No. 90–7001 (Fed.Cir. June 28, 1990) ], we decline to issue the writs requested by petitioners.

*Id.*

Notwithstanding the June 6, 1991, decision of this Court in *Nagler/Jones,* a VA hearing officer in the Cleveland RO sent a letter dated August 13, 1991, to appellant Jones, which contained unsolicited legal advice with respect to, *inter alia,* the nature and scope of attorney Snyder's representation of Jones and the permissible terms of any fee agreement between Mr. Jones and Mr. Snyder. The letter, which also emphasized the criminal sanctions which could be imposed for violation of fee statutes, was, as the Secretary agrees, filled with inaccurate statements and legal judgments which were wholly wrong as a matter of law. It was this letter which prompted the appellants to file, on August 21, 1991, a Second Petition For Extraordinary Writ and Sanctions (Second Petition), seeking once again to enjoin the RO from contacting Mr. Sny-

der's clients regarding fee arrangements and to impose monetary sanctions for interference with the attorney-client relationship.

On August 28, 1991, the Court ordered the Secretary to respond to the Second Petition and set the petition for oral argument. On September 3, 1991, the Court granted the motion of William G. Smith, Esquire, a petitioner in the original consolidated case, to submit an amicus curiae brief.

Shortly after filing the Second Petition, attorney Snyder received a letter dated August 27, 1991, from the VARO in San Diego which included, *inter alia,* VA Form 2–22a (APR 1991), entitled "Appointment of Attorney or Agent as Claimant's Representative". Block 11 of Form 2–22a (APR 1991), headed "Fee Agreement Filing Requirements", which specifically requests that the represented veteran and his representative indicate if they are claiming an exemption from the statutory requirement that any fee agreements be filed. Block 12 contains language which appears to require an agreement by the veteran and the representative, as a result of their each signing the form, that "no fee or compensation will be charged or received for services rendered ... except as provided" by referenced statutes. Because there is neither a statutory requirement that a fee agreement exist, nor any statutory "exemptions", nor any authority which mandates that the claimant and the attorney agree to be bound by the statute as a condition of representation, on September 4, 1991, petitioners filed an Amended Second Petition For Extraordinary Writ and Sanctions (Amended Second Petition). The Amended Second Petition seeks, in addition to the relief requested in the original Petition, to enjoin Regional Offices from distributing VA Form 2–22a (APR 1991) until the form is revised.

The Secretary's response, which was filed on September 5, 1991, conceded that the August 13, 1991, letter was unauthorized, wrong as a matter of law, and contrary to the letter and the spirit of the *Nagler/Jones* opinion:

It was well settled in *Nagler[/Jones] v. Derwinski, supra,* that "any communication from Regional Offices with attorneys or their clients in connection with the terms of fee agreement[s]" is absolutely prohibited. *Id.* at 13 [306]. The communication here clearly contravened the explicit holding in *Nagler[/Jones]*. Not only was it without authority, but it might be deemed injurious to the professional relationship of attorney and client.

Respondent's Answer to Second Pet. (Resp. Ans.) at 4.

Oral argument was held on September 10, 1991. On September 25, 1991, pursuant to an order of the Court, supplemental memoranda were filed by petitioners and the Secretary. On October 28, 1991, the Court granted the Secretary's motion for leave to file an additional exhibit, a new VA "publication generated by the Office of the General Counsel, entitled 'Court of Veterans Appeals Notes'". Respondent's Motion for Leave (Resp. Mot.) at 2. On October 30, 1991, the Court granted the motion of petitioners for leave to file additional exhibits. The proffered exhibits consist of correspondence between petitioner Snyder and the VARO in San Juan, Puerto Rico.

## II. THE AUGUST 13, 1991, LETTER AND INJUNCTIVE RELIEF

### A.

There is no dispute that the August 13, 1991, letter from the Cleveland RO to appellant Jones was without legal authority, wrong as a matter of law, and contrary to this Court's June 6, 1991, opinion. The Secretary concedes as much:

Unfortunately, a little over two months after the issuance of the *Nagler[/Jones]* opinion, due to a series of unforeseen and regrettable circumstances, inadvertent repetition of unauthorized and erroneous communication occurred in the companion case *Jones,* involving the Cleveland VARO.

*Id.* at 3–4. Indeed, the Secretary underscored the seriousness of the breach and failure to comply with *Nagler/Jones: "The communication here clearly contravened the explicit holding in Nagler[/Jones].* Not only was it without authority, but it might be deemed injurious to the professional relationship of attorney and client." *Id.* at 4 (emphasis added). At oral argument, counsel for the Secretary agreed that the letter "is wholly incorrect legally". Hearing of September 10, 1991, Transcript (hereinafter "Tr.") at 26. In the Secretary's supplemental response it is noted that "the fourth and fifth paragraphs [of the August 13, 1991, letter] contain statements which inaccurately describe current law pertaining to attorney fees payable in VA claims matters". Respondent's Supplemental Memorandum (Resp.Supp.Mem.) at 3. Petitioners assert far more pervasive errors. *See* Petitioners' Supplemental Memorandum Addressing Legality of Statements in August 13, 1991, Letter.

### B.

However, the unauthorized and inaccurate letter of August 13, 1991, is only a symptom of a larger problem. The Amended Second Petition, the consequent filings and oral argument unequivocally document that no meaningful steps were taken, either before or after the Court's June 6, 1991, decision in *Nagler/Jones,* to ensure that such letters were not sent by the Regional Offices. In essence, the Secretary's response to this Amended Second Petition consisted of a recitation of the actions taken, or, for the most part, actions not taken, by subordinate components of the Department of Veterans Affairs. For example, the author of the August 13, 1991, letter advised that he "was unaware of the Court of Veterans Appeals decision of June 6, 1991". Resp.Ans., Ex. 1 at 2. This is not surprising in view of the direction and attitude that characterized an internal communication, dated April 23, 1991, which emanated from the Director of the VA's Compensation and Pension Service (C & P):

A COVA decision which remands a case to BVA does not require revision of regulations or procedures. A COVA decision which does not establish a new legal principle or void an existing regulation does not require nationwide attention.

*COVA decisions are based on facts presented in an individual case and not on legal theory.*

Resp.Supp.Mem., Ex. 10 (emphasis added). In hindsight, it is also not surprising that the hearing officer in Cleveland never received either the *Nagler/Jones* decision or guidance from his supervisors or superiors in C & P. The individual in C & P "designated to act as liaison ... with the Board of Veterans['] Appeals and the General Counsel of the Department of Veterans Affairs" personally did not learn of the *Nagler/Jones* decision until he "obtained a copy of the decision from the Court in mid-August". Resp.Ans., Ex. 4 at 1–2.

At oral argument on the Second Amended Petition, which was held on September 10, 1991, the Acting General Counsel, with commendable candor, stated that the VA, almost three years after enactment of the Veterans' Judicial Review Act (Pub.L. No. 100–687, Div. A., 102 Stat. 4105 (1988) (VJRA)), and two years after the convocation of this Court, was still not prepared for judicial review:

> We weren't prepared for its impact on us, we weren't prepared for the impact it would cause on the whole process; and we have been slow to react. And it is just like an ocean liner, it has been very difficult and frustrating stopping [it] and getting started in another direction.

Tr. at 27.

We find the Acting General Counsel's analogy to an ocean liner to be a particularly apt one, though perhaps not for the reason it was proffered. Arduous as it may be, ocean liners do change course on the high seas. The decision to initiate a change, however, does not come from the engine room or the radio room, from the ship's purser, engineer or doctor. On the contrary, the order to change course comes from the top, the captain on the bridge. We find nothing presented in this case up to and during the oral argument on the Second Petition which would indicate that there was, in fact, a decision made at the top—at the Secretarial level—to change the course of the Department of Veterans Af-

fairs with respect to judicial review and the decisions of this Court.

However, it does appear from materials filed and developments occurring subsequent to the oral argument that, as a result of the Second Amended Petition in this case, orders have issued from the bridge and that the course of the VA may indeed be changing. Exhibit 13 to Respondent's Supplemental Memorandum consists of a memorandum from the Secretary of Veterans Affairs dated September 17, 1991, and directed to the senior officers in the VA. The memorandum, entitled "Judicial Review Implementation", takes note of the "need for improving our process of disseminating and implementing the decisions handed down by the new Court of Veterans Appeals", and concludes that "we are committed to assuring the Court, and our veterans, that we are aware of the mandate of the law as interpreted by the new Court, and are implementing it properly and promptly".

On September 23, 1991, the Chief Benefits Director issued Circular 20–91–19 (Resp.Sup.Mem., Ex. 15), which forwarded "for immediate implementation" the instructions of the General Counsel designed to prevent "future improper communications with respect to fee agreements between claimants and their attorneys". A memorandum dated September 19, 1991, by the Acting General Counsel (Resp.Supp. Mem., Ex. 14), directs all district counsels to discuss the Secretary's September 17, 1991, memorandum with regional directors and adjudication officers and to emphasize the need for the implementation of the decisions of this Court in general and the *Nagler/Jones* decision in particular.

At oral argument, the Acting General Counsel advised that a digest of this Court's opinions would be prepared quarterly and distributed to the Board of Veterans' Appeals and the Compensation and Pension Service for further distribution to the Regional Offices. Tr. at 28. He stated that he and other senior officials of the VA would meet with representatives of veterans groups and other interested persons (he specifically invited attorney Snyder) to

discuss the digest presently in preparation as well as other proper and effective means of communicating and effectuating the decisions of this Court. In addition, the Acting General Counsel committed himself to

> a new process where besides providing copies of decisions of the Court to the [VA's Veterans Benefits Administration], my office will provide written interpretative guidance to the [Chief Benefits Director] at the time of transmittal with respect to any decisions of the Court which address legal issues in a manner that calls for VA procedures to be re-evaluated or modified or which otherwise necessitates review of broad legal or policy issues.

Tr. at 30. As noted in Part I, *supra*, a copy of the first issue of this digest of the Court's opinions, which is dated October 1991 and entitled "Court of Veterans Appeals Notes", was filed with the Court on October 28, 1991. Resp.Mot. at 2. The Secretary notes that the publication will be updated quarterly and distributed within the Department and "to the major veterans service organizations, the National Association of State Veterans' Affairs Directors, and the Chairmen and Ranking Minority Members of the House and Senate Veterans' Affairs Committees". *Id.*

### C.

While petitioners can take some consolation in the fact that their efforts appear to have succeeded in initiating a positive change of course by the Department of Veterans Affairs, they are entitled to more than just consolation. Petitioners should not have had to resort to this Court to secure a change which should have been initiated by the Department itself. Had appropriate directions been issued and followed, there would have been no improper conduct in the first instance and no August 13, 1991, letter in the second. Had the misrepresentations made by the Secretary's representative at the hearing on the original petition been corrected, the Court may well have been compelled to initiate the change in course which the Department had been resisting. In sum, petitioners were forced to expend time, energy and funds to seek redress of grievances which resulted from the Department's "egregious unprofessional conduct" (*Nagler/Jones*, at 306) and the breach of professional obligations by the Secretary's representatives described in Part IV, *infra.*

Congress specifically provided that this Court would "have such assistance in carrying out of its lawful writ, process, order, rule, decree, or command as is available to a court of the United States". 38 U.S.C. § 7265(b) (formerly § 4065(b)). This "assistance" includes the authority to exercise jurisdiction under the All Writs Act, 28 U.S.C. § 1651(a). *See Erspamer v. Derwinski*, 1 Vet.App. 3 (1990). As we said in *Erspamer*, there is a two-pronged test which must be satisfied for such relief. *Id.* at 9. Petitioners have fulfilled this test because they have demonstrated both that they are entitled to injunctive relief and that there is available no other adequate means of ensuring that they will be free from erroneous and unauthorized communications from the VA Regional Offices concerning fee agreements. *Nagler/Jones*, at 302–03. In the words of the Secretary, "the [August 13, 1991, letter] clearly contravened the explicit holding in *Nagler*. Not only was it without authority, but it might be deemed injurious to the professional relationship of attorney and client". Resp.Supp.Mem. at 4. Recent actions by the Secretary and the Department ultimately may result in effective corrective action but the history of this case demonstrates that promises or reports of corrective action are not adequate. Accordingly, the Secretary will be prohibited from making all such erroneous and unauthorized communications.

### III. VA FORM 2–22a AND INJUNCTIVE RELIEF

#### A.

The Secretary argues that VA Form 2–22a (APR 1991), "Appointment of Attorney or Agent as Claimant's Representative", and its predecessors, enables the VA to fulfill a specific statutory mandate. The purposes of the current form, which was

revised in April 1991, are to enable a veteran to formally appoint a representative and to provide the VA with the name and address of that representative so that, among other purposes, contact can be properly initiated and continued with respect to the claim. The form also serves as a record of the claimant's consent or refusal to consent to the limited disclosure of records which are subject to protection under 38 U.S.C. § 7332 (formerly § 4132). The form advises both the claimant and the representative of the precise statute, 38 U.S.C. § 5904(c) (formerly § 3404(c)), which governs representation. Moreover, VA Form 2–22a (APR 1991) does not constitute communication *from* the Regional Office; it is the vehicle used by the claimant and the representative to communicate *to* the RO the existence of the representative relationship. Petitioners do not take issue with the continued use of VA Form 2–22a (APR 1991) in any of these respects, and we find that the general employment of VA Form 2–22a (APR 1991), except as detailed below, does not offend the letter or the spirit of *Nagler/Jones.*

Petitioners' complaint is specifically directed to blocks 11 and 12 of Form 2–22a (APR 1991). Block 11, which is headed "Fee Agreement Filing Requirements", provides as follows:

> In instances where payment of fees for representation is permitted under section 5904(c), Title 38, U.S.C., a copy of the agreement for the payment of such fees must be filed at the following address unless an exemption applies: Special Assistant for Legal Affairs (01C3), Board of Veterans Appeals, 810 Vermont Avenue, NW, Washington, DC 20420. If an exemption from filing is claimed, please check one of the following: ___ Representation is at no cost. ___ Fees are being paid by a disinterested third party.

As petitioners argue, block 11 contains misleading and erroneous information about fee agreements because it indicates that "where payment of fees ... is permitted ... a copy of the agreement ... must be filed". The governing statute, 38 U.S.C. § 5904, does not require that a representative enter into a fee agreement with a veteran; it requires only that if there is representation before the VA or the Board after "the Board first makes a final decision" the representative "shall file a copy of *any* fee agreement ... with the Board at such time as may be specified by the Board". 38 U.S.C. § 5904(c)(2) (emphasis added). Similarly, 38 U.S.C. § 7263(c) (formerly § 4063) provides that, with respect to representation before this Court, a representative "shall file a copy of *any* fee agreement ... with the Court at the time the appeal is filed". (Emphasis added.) Further confusion results from the statement that the fee agreement must be filed "unless an exemption is claimed" because the statute does not provide for exemptions.

As to block 12, it seems to require that the claimant and the attorney or agent signing Form 2–22a signify their "agree[ment]" that "pursuant to Chapter 59, Title 38, U.S.C., no fee or compensation shall be charged or received for services rendered under this power of attorney in the adjudication of claims before the Department of Veterans Affairs except as provided in sections 784 and 3404, Title 38, U.S.C." The use of the words "It is understood that" constitutes an unauthorized, misleading, and damaging communication about fee agreements from the VA to attorneys and their clients in violation of our opinion in *Nagler/Jones.*

First, the Secretary has no authority to require such an undertaking by the attorney and client. The Secretary does appear to have substantial authority under 38 U.S.C. § 5904(a) and (b) (formerly § 3404) to communicate with, and regulate representational activities by, attorneys (and agents) in connection with recognizing them for claims representation before the Department and suspending them from such practice for engaging in certain specified conduct (including violation of any laws administered by the VA). This authority clearly permits the VA to require an attorney (or agent) applying for recognition to certify as to satisfaction of certain basic statutory qualifications (good moral character, training, and competence, for ex-

ample) and would seem to permit the VA to require an attorney (or agent) applicant to agree to follow the law governing representation. But VA communication, in connection with such matters, with claimants represented by attorneys is another matter entirely. We would be loathe to find authority for VA communication to such represented claimants except where that authority is expressly provided by statute, such as in 38 U.S.C. § 7104(e) (formerly § 4004) with respect to sending copies of BVA decisions directly to the claimant as well as any representative, or where the Secretary is carrying out a "quasi-judicial" function as to which the claimant's interest may be adverse to the attorney's (*see Nagler/Jones*, at 303–05), or where the VA, pursuant to 38 U.S.C. § 5904(b), is investigating a complaint of improper or unauthorized practice or conduct by a representative. Hence, we find all other such VA communication *to represented claimants* to be unauthorized.

Second, an attorney is already bound, by his oath upon admission to the bar of any state or other jurisdiction and as an officer of the court, to adhere to the highest standards of moral conduct; this subsumes upholding all laws. *See Schware v. Board of Bar Examiners of the State of New Mexico*, 353 U.S. 232, 249, 77 S.Ct. 752, 761, 1 L.Ed.2d 796 (1957) (Frankfurter, J., concurring) ("It is a fair characterization of the lawyer's responsibility in our society that he stands 'as a shield,' ... in defense of right and to ward off wrong. From a profession charged with such responsibilities there must be exacted those qualities of truth-speaking, of a high sense of honor, of granite discretion, of the strictest observance of fiduciary responsibility, that have, throughout the centuries, been compendiously described as 'moral character'."); 7 C.J.S. *Professional Misconduct* § 77 (1980) ("[p]rofessional misconduct includes violations of the oath of office and any conduct which tends to bring reproach on the legal profession or to alienate the favorable opinion which the public should entertain concerning it"). More generally, the American Bar Association's Model

Rules of Professional Conduct state in part: "A lawyer's conduct should conform to the requirements of the law, both in professional service ... and personal affairs." MODEL RULES OF PROFESSIONAL CONDUCT Preamble (1989). *See also* MODEL CODE OF PROFESSIONAL RESPONSIBILITY DR 1–102(A)(4) (1969) (prohibiting lawyer from engaging in conduct "involving dishonesty, fraud, deceit, or misrepresentation").

Third, a client must be able to trust that an attorney will uphold the law, in order for a productive attorney-client relationship to develop. *See Nagler/Jones*, at 305 ("the very core of the attorney-client relationship ... must be firmly rooted in trust and confidence"). Consequently, the suggestion to the client by the Secretary, through block 12, that an attorney's oath generally is not sufficient to ensure that he or she will uphold the law, but rather must be supplemented by an express agreement to do so, serves to undermine the trust reposed in the attorney by his or her client, thereby impermissibly disrupting the attorney-client relationship.

Moreover, the words "It is understood and agreed that" not only exceed the Secretary's authority and disrupt the attorney-client relationship, but they also create confusion by giving the mistaken impression that the Secretary has some responsibility to monitor the payment of attorney fees as to VA benefits claims. Such review is a responsibility reposed by statute in the Board of Veterans' Appeals as to representation undertaken before it or the VA, *see* 38 U.S.C. § 5904(c)(2) (formerly § 3404); *In the Matter of the Fee Agreement of William G. Smith in Case Number 90–58*, 1 Vet.App. 492, 495–96 (1991) (per curiam), and in the Court as to representation undertaken before it, *see* 38 U.S.C. § 7263(c), (d) (formerly § 4063); *In re Smith*, at 495 (per curiam), 13 (concurring opinion).

For these reasons, we are compelled to agree with the petitioners that block 11 of VA Form 2–22a (APR 1991) and the words "It is understood and agreed that" in block 12 are misleading and without statutory authority. Accordingly, the Secretary will be prohibited from transmitting blank cop-

ies of VA Form 2–22a (APR 1991) to claimants and representatives which do not have block 11 and the offending language of block 12 deleted or masked.

## B.

■ On October 30, 1991, the Court granted the motion of petitioners for leave to file additional exhibits. The proffered exhibits consist of correspondence between petitioner Snyder and the VARO in San Juan, Puerto Rico. By letter dated August 22, 1991, Mr. Snyder advised the San Juan VARO that he was representing a veteran, requested that all contacts with the client be "directed to me solely as his attorney", and enclosed both a copy of the fee agreement and a power of attorney executed by the veteran which, by its terms and in bold type, "revoke[d] any prior powers of attorney". Petitioners' Motion for Leave, Ex. 2.

The VARO Adjudication Officer, in a letter dated October 11, 1991, advised Mr. Snyder that the current "Power of Attorney must remain in effect until we have received a statement signed by your client, showing the nature and extent of your representative capacity. The statement should also state whether the prior Power of Attorney is to remain in effect or be revoked". *Id.* at Ex. 3. Enclosed with the Adjudication Officer's letter was a July 1985 version of VA Form 2–22a which indicated that "a fee not exceeding ten dollars ($10) may be paid to the ... attorney". *Id.* at Ex. 4.

The Adjudication Officer sent Mr. Snyder an outdated VA Form 2–22a on October 11, 1991, thirty-one days after oral argument in this case, twenty-four days after the Secretary's memorandum on the subject of "Judicial Review Implementation" (Resp. Supp.Mem., Ex. 13), and eighteen days after the Chief Benefits Director issued Circular 20–91–19 which was intended to prevent "future improper communications with respect to fee agreements between claimants and their attorneys". *Id.* at Ex. 15. Simply stated, the July 1985 version of the form predates by three years the VJRA, and the repeal of the ten dollar attorney fee limitation contained therein;

the information on the form is wrong as a matter of law, and it has been wrong since the VJRA was enacted on November 18, 1988. Use of such an outdated form, which can only spread confusion and misinformation and impair the privileged relationship between a claimant and his or her representative, cannot be permitted. Accordingly, the Secretary will be prohibited from using any editions of VA Form 2–22a which predate the enactment of the VJRA.

## IV.  SANCTIONS

### A.

During the oral argument of the initial petition for extraordinary writ and sanctions, in response to a specific question from the Court, the Secretary's representative expressed the belief "that the Chairman of the BVA has written all regional offices recently (during the pendency of this action, frankly) redemonstrating [sic] them not to contact attorneys in any of these type cases". Resp.Ans. at 7. The Court, in denying the request for extraordinary relief and sanctions, made specific reference to its having been "advised that the new Chairman of the Board of Veterans' Appeals had attempted to remedy the problem by reminding all of the Regional Offices, and presumably his own staff, that obsolete forms and obsolete legal advice must not be communicated". *Nagler/Jones,* at 306. It was only "[u]nder these circumstances" (*id.* at 306), that the Court was willing to refrain from granting the requested relief.

It is now clear that the belief of the Secretary's representative, a belief which we have no doubt was held and expressed in good faith, was not factually accurate. It is also clear that the Secretary's representative learned immediately after oral argument that the belief expressed was, in fact, erroneous. Resp.Supp.Mem. at 9–11. Yet no effort was made to advise the Court promptly of the inaccuracy either after oral argument or after issuance of the opinion which had expressly relied on that statement. The fact that no guidance had been given by the Secretary, or anyone else, to the Regional Offices with respect to com-

munication with represented claimants, particularly about fee agreements, did not come to light until the filing of the second petition.

Although the Secretary acknowledges that the failure to correct the record was "regrettable" (*id.* at 11), he offers as justification the belief "that sufficient action had been taken to ensure that the substance of his statement to the Court at the argument had been effectuated". *Id.* at 10. This statement, however, evidences errors of judgment on at least two levels.

The first and most obvious error is a factual one: the second belief was as mistaken as the first. The August 13, 1991, letter demonstrates that remedial measures certainly had not been "effectuated". The second error of judgment, while perhaps not as obvious, is nevertheless even more serious: The Secretary and his representatives were under a duty to correct the record, not to decide for themselves whether subsequent developments were sufficient to justify after the fact a statement which was wrong when it was made. It was for the Court to determine whether the efforts were sufficient to forestall extraordinary relief or sanctions.

The importance of the second misjudgment cannot be overstated. While, of course, great care should be taken to prevent such occurrences, and "I do not know but will find out and advise the Court" may be an acceptable response in some instances, the Court recognizes that misstatements can occur under the fire and heat of oral arguments, particularly under the circumstances presented here when the Court had to turn to a supervisory attorney when the attorney arguing the case was unable to respond to its inquiry. Nonetheless, the Court must be able to rely upon the representations of those who practice before it and there is an inherent professional obligation imposed upon attorneys to correct misstatements. *See, e.g.,* MODEL RULES OF PROFESSIONAL RESPONSIBILITY Rule 3.3 (1989) (*Candor Toward the Tribunal,* section 3.3(a)(4) provides in pertinent part: "If a lawyer has offered material evidence and comes to know of its falsity, the lawyer

shall take reasonable remedial measures."); MODEL RULES OF PROFESSIONAL CONDUCT FOR FEDERAL LAWYERS Rule 3.3 (1990). Here, the major breach was the failure to correct the statement once it was learned that it was inaccurate, a failure which was compounded by the fact that no effort was made to correct the misstatement after it specifically was relied on by the Court in its decision.

## B.

█ Congress invested the Court with the
> power to punish by fine or imprisonment such contempt of its authority as—
>
> (1) misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice;
>
> (2) misbehavior of any of its officers in their official transactions; or
>
> (3) disobedience or resistance to its lawful writ, process, order, rule, decree, or command.

38 U.S.C. § 7265 (formerly § 4065). Even if Congress had not chosen to convey express authority to punish for contempt, this Court would have the power to sanction those who abuse the judicial process under the "inherent power of the federal courts". *Chambers v. NASCO, Inc.,* —— U.S. ——, 111 S.Ct. 2123, 2132, 115 L.Ed.2d 27 (1991); *Ex Parte Robinson,* 19 Wall. 505; 22 L.Ed. 205 (1873); *Anderson v. Dunn,* 6 Wheat. 204, 5 L.Ed. 242 (1821).

From the "moment the courts of the United States were called into existence and invested with jurisdiction over any subject, they became possessed of this power [to punish contempt] . . . by fine or imprisonment". *Ex Parte Robinson,* 19 Wall. at 510–12, 22 L.Ed. at 207–08. This inherent power "is essential to the preservation of order .. and to the enforcement of the judgments, orders and writs . . . and consequently, to the due administration of justice". *Id.,* 19 Wall. at 510. *See also Anderson,* 6 Wheat. at 227, 5 L.Ed. at 248 ("courts of justice are . . . vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates").

"These powers are 'governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Chambers,* 111 S.Ct. at 2132 (quoting *Link v. Wabash R. Co.,* 370 U.S. 626, 630–31, 82 S.Ct. 1386, 1389, 8 L.Ed.2d 734 (1962)). Included within the scope of this inherent power is the authority to discipline attorneys before the court: "[t]he power of a court over members of its bar is at least as great as its authority over litigants." *Roadway Express, Inc. v. Piper,* 447 U.S. 752, 766, 100 S.Ct. 2455, 2464, 65 L.Ed.2d 488 (1980); *see also Ex Parte Burr,* 9 Wheat. 529, 531, 6 L.Ed. 152, 152 (1824).

That this Court was created under Article I rather than Article III is of no moment because Article I courts exercise the judicial power of the United States (*Freytag v. Commissioner of Internal Revenue,* — U.S. ——, 111 S.Ct. 2631, 115 L.Ed.2d 764 (1991)), are courts of the United States (*id.*), and have been held to have inherent power to punish for contempt. *Case v. Case,* 937 F.2d 1014, 1023 (5th Cir.1991) ("The power to assess attorneys fees, like other inherent powers ... is based on the need to control court proceeding[s] and necessity of protecting the exercise of judicial authority in connection with those proceedings. [Citations omitted.] These principles are equally applicable to the bankruptcy court.").

■ The existence of inherent power to punish does not carry with it the unfettered authority to exercise such power. As the Court said in *Chambers,*

> Because of their very potency, inherent powers must be exercised with restraint and discretion. [Citations omitted.] A primary aspect of that discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process. As we recognized in *Roadway Express,* outright dismissal of a lawsuit, which we had upheld in *Link,* is a particularly severe sanction, yet is within the court's discretion. 447 U.S., at 765, 65 L.Ed.2d 488, 100 S.Ct. 2455 [2463]. Consequently, the "less severe

sanction" of an assessment of attorney's fees is undoubtedly within a court's inherent power as well. *Ibid.*

111 S.Ct. at 2132.

In addition to exercising restraint and discretion, a court considering sanctions, whether based on inherent or express statutory authority, must take care to determine that the conduct at issue actually abused the judicial process. *See Roadway Express,* 447 U.S. at 766, 100 S.Ct. at 2464 ("a court ... certainly may assess those expenses [counsel fees] against counsel who wilfully abuse judicial processes"). "Mere disrespect, insult, or an affront to a court's sense of dignity are insufficient." *See United States v. Thoreen,* 653 F.2d 1332, 1340 (9th Cir.1981), and the cases cited therein.

■ In the matter at issue, the Court is convinced that the failure on the part of the representatives of the Secretary to correct a statement which they learned was false directly abused the judicial process and that sanctions are warranted. The failure to correct promptly a statement made in response to a direct question from the Court, a statement which was discovered to have been false and which was expressly relied upon by the Court, constituted "misbehavior [which obstructed] the administration of justice." 38 U.S.C. § 7265(a)(1). The Secretary "strongly urge[s] the Court that any failure [to correct the record] was of an institutional, and not personal, nature". Resp.Supp.Mem. at 12. Although the distinction may not be of interest to petitioners, it is of considerable import to the Secretary's representatives. If the improper conduct was solely due to individual "fault or negligence", then the individual attorney would be personally responsible for the satisfaction of a financial sanction. 44 Comp.Gen. 312 (1964). On the other hand, "the United States may bear expenses, including court-imposed sanctions, which a government employee incurs because of an act done in the discharge of his official duties". 59 Comp. Gen. 489 (1980). Under the unique circumstances presented by this case, the Court is inclined to agree with the Secretary that

the errors of judgment were indeed institutional, but this conclusion does not lessen the seriousness of the offense which, in the Court's view, compels the imposition of sanctions.

The Court has given very serious consideration to imposing a fine, such as petitioners requested, based on the misconduct of the Secretary's representatives. However, in view of the actions very recently taken by the Secretary, the Acting General Counsel and the Chief Benefits Director, a majority of this panel does not find that sanctions beyond the payment of expenses and attorney fees are necessary at this time. For the second time in this case, the Court will exercise restraint but, in so doing, it is not unmindful of the breach of trust which prompted this Second Petition. It would be fair to surmise that the Court's patience is not limitless; indeed, as suggested by the concurring opinion, the limit has been reached in this case.

Pursuant to its statutory authority, the Court will require the Secretary, as a sanction, to compensate petitioners for the expenses and the professional time invested in this Second Petition. While it has yet to be determined whether the Equal Access to Justice Act, 28 U.S.C. § 2412, applies to proceedings before this Court, we will use the provisions of that Act as a guide to the intent of Congress with respect to the appropriate measure of amount of the attorney fees to be assessed against the Secretary.

## V. RELIEF

Based upon the foregoing, with respect to the petition for extraordinary relief, it is:

ORDERED that the Secretary of Veterans Affairs, directly and indirectly by the official acts of officers or employees of the Department of Veterans Affairs under delegation, redelegation, or assignment from the Secretary, such acts having "the same force and effect as though performed or rendered by the Secretary" (38 U.S.C. § 212(a)), is prohibited from:

1. Initiating communication by the Chief Benefits Director or employees of the Veterans Benefits Administration with any claimant represented (now or in the future) by petitioner Snyder concerning such representation and the nature and scope of any fee agreement, except where such communication is in furtherance of an investigation or proceeding conducted pursuant to 38 U.S.C. § 5904(b);

2. Sending, transmitting, or in any way disseminating to claimants or representatives blank editions of VA Form 2–22a which predate the date of enactment of the VJRA, November 18, 1988; and

3. Sending, transmitting, or in any way disseminating to claimants or representatives blank copies of VA Form 2–22a (APR 1991) unless block 11 and, insofar as it pertains to attorneys, the clause "It is understood and agreed that," of block 12 are deleted or masked.

With respect to the petition for sanctions, it is:

ORDERED that, pursuant to 38 U.S.C. § 7265, as a sanction for the abuse of the judicial process by the Secretary's representatives in failing to correct promptly a statement to the Court during oral argument which they subsequently learned was false, the Secretary will reimburse petitioners for the expenses and professional time invested in the prosecution of the second petition; it is further

ORDERED that petitioners, within fourteen days after the date of this order, file with the Court and serve upon the Secretary an itemization of the expenses and the professional time invested as a result of the Second Petition and the Amended Second Petition. Petitioners may include an argument with respect to any "special factors" they believe warrant the imposition of compensation at a rate higher than the statutory rate of $75 per hour (28 U.S.C. § 2412(d)(2)(A)); it is further

ORDERED that the Secretary may respond to petitioners' itemization and argument, if any, such response to be filed within 14 days after the date of the petitioners' filing; and it is further

ORDERED that the Secretary's Motions for Extension of Time to Respond to Petitioners' Pending Motion filed on November

6, 1991, and November 20, 1991, are denied as moot; the "pending" motion was granted by order of this Court dated October 30, 1991.

MANKIN, Associate Judge, concurring:

The majority has properly stated the law and the facts of this case but having done so has not gone far enough. I would impose a large monetary sanction against the Secretary for the very conduct described in 38 U.S.C. § 7265(a)(1) as it relates to the Court. Justice as well as the rights of petitioners has been violated.

While the relief granted in this case must necessarily be limited to the petitioners, it is clear that the Court would expect respondent to understand the Court's position in the event similar fact situations arise in the future.

STEINBERG, Associate Judge, concurring:

I concur fully in the excellent opinion of the Court. As Judge Mankin suggests in his opinion, the holding of this case, although not the injunctive relief, applies to any communication initiated by the Veterans Benefits Administration of the Department of Veterans Affairs (VA) with a VA claimant represented by an attorney. Such communications are unlawful except as provided in the Court's order, above. The relief granted in this case could not extend expressly to attorney William G. Smith who submitted a brief as amicus curiae. He is not a party to this proceeding as he was in the original consolidated cases, *Nagler/Jones v. Derwinski*, 1 Vet.App. 297 (1991). Although, in retrospect, in light of the VA's unwarranted assurances to the Court and VA's subsequent repetition of unlawful actions, it might appear that the injunctive relief there sought by Mr. Smith, as well as by this case's petitioners at that time, was warranted, that matter is not presently before the Court.