# UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS

No. 22-3306

GEORGE D. PREWITT, JR., PETITIONER,

V.

DENIS MCDONOUGH,
SECRETARY OF VETERANS AFFAIRS, RESPONDENT.

Before PIETSCH, FALVEY, and JAQUITH, *Judges.*

## O R D E R

PIETSCH, *Judge*, filed the opinion of the Court. FALVEY, *Judge*, and JAQUITH, *Judge*, filed concurring opinions.

On June 2, 2022, self-represented Army veteran George D. Prewitt, Jr., filed a petition for extraordinary relief regarding a case that was previously before the Court but was remanded in part to the Board of Veterans' Appeals (Board). Mr. Prewitt asserts that structural constitutional problems prevent the Board from adjudicating his case, and he asks the Court to take jurisdiction and resolve these issues. Because he does not show that he is entitled to extraordinary relief, we will deny his petition.

## I. FACTS

In July 2019, Mr. Prewitt appealed an April 2019 Board decision that denied various elements of several disability claims. In July 2020, the Court issued a single-judge decision affirming the Board decision in part, dismissing it in part, and setting it aside in part, and remanding the set aside matter.

In appealing the April 2019 Board decision, Mr. Prewitt argued that VA had violated his rights under the U.S. Constitution's Due Process and Takings Clauses. But the Court declined to address Mr. Prewitt's constitutional arguments, finding that the Board had failed to consider relevant evidence and that remand was thus necessary for the Board to consider the evidence in the first instance. *See Prewitt v. McDonough*, No. 19-5262, 2020 WL 4103039, at \*3-4 (Vet. App. July 21, 2020) (mem. dec.) (citing *Mahl v. Principi*, 15 Vet.App. 37, 38 (2001) (per curiam order) ("[I]f the proper remedy is a remand, there is no need to analyze and discuss all the other claimed errors that would result in a remedy no broader than a remand.")); *see Hensley v. West*, 212 F.3d 1255, 1263-64 (Fed. Cir. 2000) (noting that when a court of appeals reviews a lower court's decision, it may remand the case if the previous adjudicator failed to make findings of fact essential to the decision).

Mr. Prewitt then appealed to the U.S. Court of Appeals for the Federal Circuit (Federal Circuit). In March 2021, the Federal Circuit dismissed his appeal, declining to review the matters

remanded by this Court to the Board and finding that Mr. Prewitt's constitutional challenges were inextricably intertwined with the remanded matters. *See Prewitt v. McDonough*, 856 F. App'x 280, 282-83 (Fed. Cir. 2021). Mandate for this Court's single-judge decision issued in September 2021.

In June 2022, Mr. Prewitt filed this petition, asking the Court to take jurisdiction over and decide questions of "structural[] constitutional" law that he claimed prevented the Board from hearing his case on remand. *Prewitt v. McDonough*, U.S. Vet. App. No. 22-3306, June 2, 2022, Amended Petition for Extraordinary Relief (Petition) at 1. He also moved for initial review by a panel, which was later granted. Petitioner's June 6, 2022, CAVC Rule 27.1 Motion for Initial Review by a Panel; Aug. 18, 2022, Judge's Stamp Order Granting Motion for Review by Panel. The Court ordered the Secretary to respond to the petition. June 10, 2022, Order. In response, the Secretary asked the Court to construe the petition as requesting a writ of mandamus and to deny it. July 11, 2022, Secretary's Response to Petition for Extraordinary Relief and Court Order Dated June 10, 2022. Thereafter, Mr. Prewitt filed a motion to amend his petition, which the Secretary opposed. Petitioner's Sept. 1, 2022, Motion for leave to file an Amendment to the Petition as set out below; Sept. 15, 2022, Secretary's Opposition to Motion for Leave to File an Amendment to the Petition.

## II. ANALYSIS

This Court has the authority to issue extraordinary writs in aid of its jurisdiction pursuant to the All Writs Act, 28 U.S.C. § 1651(a). *See Cox v. West*, 149 F.3d 1360, 1363-64 (Fed. Cir. 1998). However, "[t]he remedy of mandamus is a drastic one, to be invoked only in extraordinary situations." *Kerr v. U.S. Dist. Court*, 426 U.S. 394, 402 (1976).

Accordingly, three conditions must be met before a court may issue a writ: (1) the petitioner must lack adequate alternative means to attain the desired relief, thus ensuring that the writ is not used as a substitute for an appeal; (2) the petitioner must demonstrate a clear and indisputable right to the writ; and (3) the Court must be convinced, given the circumstances, that issuance of the writ is warranted. *See Cheney v. U.S. Dist. Court*, 542 U.S. 367, 380-81 (2004).

Pursuant to Rule 21(a), a petition for an extraordinary writ must, among other things,

> (1) state the precise relief sought; (2) state the facts necessary to understand the issues presented by the petition; (3) state the reasons why the Court should grant the petition, including why the petitioner has a clear and indisputable right to the writ and why there are inadequate alternative means to obtain the relief sought; [and] (4) include an appendix containing copies of any order or decision or any other documents necessary to understand and support the petition.

U.S. Vet. App. R. 21(a).

Initially, the Court notes that though Mr. Prewitt filed a petition for extraordinary relief, he does not address the conditions that would warrant the issuance of a writ of extraordinary relief, nor does he comply with Rule 21. However, even overlooking his failure to explain why he has a clear and indisputable right to the writ and why there are inadequate alternative means to obtain

2

the relief he seeks, the Court finds, based on the arguments in his petition, that he has failed to show entitlement to extraordinary relief.

In the underlying July 2020 decision, the Court vacated the part of the Board decision that denied revision of a June 1970 rating decision based in part on the Board's failure to address favorable evidence, to discuss whether Mr. Prewitt had received notice of his appellate rights, and to discuss whether the RO had rated his cranial nerve and muscle injuries separately. The Court remanded the matter. The Court declined to address other arguments raised by Mr. Prewitt. After he appealed, the Federal Circuit also "decline[d] to review" Mr. Prewitt's constitutional challenges, finding that they were inextricably intertwined with the parts of the decision the Court had remanded.

Our single-judge decision and the Federal Circuit's dismissal of his appeal of that decision both directed the Board to address his constitutional challenges, a routine and accepted practice. *See Ledford v. West*, 136 F.3d 776, 780 (Fed. Cir. 1998); *Saunders v. Brown*, 4 Vet.App. 320, 326 (1993); *Hensley*, 212 F.3d at 1263-64. Nothing about the proceedings in this case is exceptional. *See Kerr*, 426 U.S. at 402.

In his petition, Mr. Prewitt raises several constitutional arguments that he believes prevent the Board from addressing certain arguments. However, the Court need not address these arguments at this time. *See Crumlich v. Wilkie*, 31 Vet.App. 194, 201 (2019); *Bucklinger v. Brown*, 5 Vet.App. 435, 441 (1993) ("It is a fundamental and long-standing principle of judicial restraint that courts avoid reaching constitutional questions in advance of the necessity of deciding them." (internal quotation marks omitted)). As the Federal Circuit has made clear, the issue-exhaustion doctrine applies to constitutional arguments. *See Morris v. McDonough*, 40 F.4th 1359, 1362 (Fed. Cir. 2022). The Board's inability to invalidate VA's adjudication process on constitutional grounds does not render presentation of that issue to the Board futile, because the Board could provide information and analysis useful to the resolution of constitutional arguments by this Court. *See Bowling v. McDonough*, 38 F.4th 1051, 1058-59 (Fed. Cir. 2022). Moreover, on remand the Board does not necessarily need to consider any of Mr. Prewitt's constitutional arguments, but instead could find another basis to rule in his favor. Accordingly, any harm in letting the remand proceed normally is purely speculative. If the Board were to reject Mr. Prewitt's arguments, he can appeal that decision to the Court and obtain the relief that he now seeks.[1] Thus, he has adequate alternative means to obtain the desired relief. *See Cheney*, 542 U.S. at 380-81. Consequently, the Court is not convinced, given the circumstances, that issuance of the writ is warranted. *Id*.

Alternatively, the Court notes that Mr. Prewitt's petition for extraordinary relief could be viewed as a request for the Court to recall its mandate in the underlying single-judge decision and to grant reconsideration. Specifically, he does not ask for a writ of mandamus or any other familiar writ but instead asks the Court to take jurisdiction over and decide constitutional questions pending before the Board on remand.

---

[1] The Court notes that, in his petition, Mr. Prewitt suggests that this Court may lack the authority to decide his constitutional arguments. However, he does not fully explain this argument and appears to ask us to not address it. *See Locklear v. Nicholson*, 20 Vet.App. 410, 416 (2006) (holding that the Court will not entertain undeveloped arguments). Thus, the Court will not consider it further.

"Recall of mandate is not ordinarily allowed. However, a court has the power to set aside any judgment and to recall mandate, where necessary to protect the integrity of its own processes." *Serra v. Nicholson*, 19 Vet.App. 268, 271 (2005) (citing *Sargent v. Columbia Forest Prods., Inc.*, 75 F.3d 86, 89 (2d Cir.1996)). The decision to recall mandate is within the discretion of the Court and "may be exercised only for good cause or to prevent injustice, and only when 'unusual circumstances exist sufficient to justify modification or recall of a prior judgment.'" (quoting *Zipfel v. Halliburton Co.*, 861 F.2d 565, 567 (9th Cir.1988)); *see McNaron v. Brown*, 10 Vet.App. 61, 62 (1997) (holding that the power to recall mandate should only be exercised in "exceptional circumstances").

In *Sagnella v. Principi*, the Court noted the following regarding its authority to recall mandate:

> Among the unusual circumstances justifying a Court's exercise of its power to recall mandate are the discovery that the judgment was obtained by fraud, the correction of clerical mistakes and judicial oversights, a subsequent change in the law, or where it is discovered that the appellant had died prior to the issuance of the mandate.

15 Vet.App. 242, 245 (2001). Mr. Prewitt has not demonstrated good cause or unusual circumstances to recall mandate. *See Smith v. Shinseki*, 26 Vet.App. 406, 410 (2014). As discussed more thoroughly above, our single-judge decision and the Federal Circuit's dismissal of his appeal were both within our normal practice and supported by caselaw. There is simply nothing unusual or exceptional about the facts in this case or the Court's remand order to warrant recalling mandate. *See McNaron*, 10 Vet.App. at 62.

### III. CONCLUSION

Based on the above considerations, it is

ORDERED that Mr. Prewitt's motion to amend his petition is denied. It is also

ORDERED that Mr. Prewitt's petition for extraordinary relief is DENIED.

DATED: December 5, 2022

FALVEY, *Judge*, concurring: I concur with the Court's opinion that Mr. Prewitt's June 2, 2022, filing, whether construed as a petition or as a motion to recall mandate, should be denied. I agree with the majority's disposition of his construed petition for a writ of mandamus, as he has not shown that he lacks adequate alternative means to receive the benefits he seeks. But I think that our rejection of the veteran's construed motion to recall mandate warrants a fuller explanation than the Court has offered. What's more, it requires us to consider this Court's place in the Constitution's structure.

Mr. Prewitt asks us to reconsider our prior memorandum decision because, in his view, the Board is unconstitutionally structured and therefore cannot render a valid decision on his benefits

4

claims. Petition (Pet.) at 2-3. He argues that Board members' appointments violate the Appointments Clause because Board members "can only be fired for cause and [their] decisions are not reviewed administratively" by principal officers in the executive branch, and thus the Appointments Clause requires them to be appointed through Presidential nomination and Senate confirmation rather than by the Secretary. Pet. at 1; *see* 38 U.S.C. § 7101A; *Edmond v. United States*, 520 U.S. 651, 663 (1997) ("[I]nferior officers are officers whose work is directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate." (internal quotation omitted)).

Given that this Court reviews Board decisions, a crucial element of the veteran's Appointments Clause argument is his contention that the Court is not part of the executive branch. He acknowledges that the Supreme Court recently stated in *United States v. Arthrex, Inc.*, that this Court is "an Executive Branch entity." *Id.* at 1-2 (quoting *United States v. Arthrex, Inc.*, 594 U.S. __, __, 141 S. Ct. 1970, 1984 (2021)). But he asserts that the Supreme Court committed a "monumental error" in doing so because this Court is, in fact, part of the judicial branch. *Id.* at 2. Looking to the Supreme Court's precedents interpreting the Appointments Clause, I think that Mr. Prewitt's structural constitutional argument has a plausible basis and, despite being incorrect, merits more than cursory disregard.

The Supreme Court has explained that the Appointments Clause is violated when an officer of the executive branch who was not appointed through Presidential nomination and Senate confirmation—such as a member of the Board—can "render a final decision on behalf the United States" without sufficient oversight from a principal officer of the executive branch. *Arthrex*, 594 U.S. at __, 141 S. Ct. at 1981-82. Neither an Article III court nor a higher-ranking principal officer who lacks "'meaningful[] control[]'" over the officer's decisions can provide the executive branch supervision required by the Appointments Clause. *Id.* (quoting *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2203 (2020)). And Board members render final, binding decisions on behalf of the United States. *See* 38 U.S.C. §§ 7102(a) 7103(a), 7104(a). Indeed, our jurisdiction depends on the Board rendering final decisions. *See* 38 U.S.C. § 7266(a). Thus, Mr. Prewitt's Appointments Clause argument is compelling—and potentially presents good cause and unusual circumstances warranting a recall of mandate—*if* he is correct in his premise that the Board is not subject to meaningful executive branch oversight.

But that premise is wrong. As the Supreme Court explained in *Arthrex*, the Board is subject to executive branch review by this Court. 594 U.S. at __, 141 S. Ct. at 1984 ("[W]hile the Board of Veterans' [Appeals] does make the final decision within the Department of Veterans Affairs . . . its decisions are reviewed by the Court of Appeals for Veterans Claims, an Executive Branch entity."). As explained below, far from committing a "monumental error," Pet. at 1, the Supreme Court's statement in *Arthrex* that this Court wields executive power not only warrants our respect, but, from a constitutional perspective, is correct.

First, the Court is not free to disregard *Arthrex*'s statement that we are an entity of the executive branch. Rather than mere dicta, *see post* at 15-16, the statement was an important part of the Supreme Court's reasoning. The Supreme Court used the statement to reject a key counterargument—that inferior officers commonly make final decisions on behalf of the executive branch that are not subject to review by a principal officer. *See Arthrex*, 594 U.S. at __, 141 S. Ct.

5

at 1983-84. The Supreme Court explained that the decisions of various inferior officers, including Board members, are subject to review by superior executive branch entities, such as (in the case of the Board) this Court. *See id*. Thus, our status as a superior "Executive Branch entity" was an important aspect of the Supreme Court's logic, not a throwaway line or incautious remark. And at any rate, even the Supreme Court's dicta carries significant weight. *See Ins. Co. of the West v. United States*, 243 F.3d 1367, 1372 (Fed. Cir. 2001) (stating that the Federal Circuit must follow a Supreme Court interpretation "even though that interpretation may be dicta").

Second, and more fundamentally, the Supreme Court was correct as a matter of constitutional law that this Court wields executive power. This should come as no surprise. Executive branch entities commonly "make rules . . . and conduct adjudications . . . and have done so since the beginning of the Republic. These activities take 'legislative' and 'judicial' forms, but they are exercises of—indeed, under our constitutional structure they *must be* exercises of—the 'executive Power.'"[2] *City of Arlington v. FCC*, 569 U.S. 290, 304 n.4 (2013).

Congress has established Article I tribunals, sometimes called "legislative courts," to adjudicate limited categories of subject matters that do not necessarily require adjudication by an Article III court. *See Stern v. Marshall*, 564 U.S. 462, 490-91 (2011); *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 583 (1985). One of these categories is "public rights" matters—that is, matters involving rights "integrally related to particular [f]ederal [g]overnment action." *Stern*, 564 U.S. at 490-91. This includes disputes arising "'between the [g]overnment and persons subject to its authority in connection with the performance of the constitutional functions of the executive or legislative departments.'" *Id.* at 490 (quoting *Crowell v. Benson*, 285 U.S. 22, 50 (1932)). The VA benefits system falls squarely within this category since VA, an executive agency, administers the legislative grant of entitlements (disability compensation for service-related injuries or illnesses) to a subset of persons under governmental authority (veterans). *See Shinseki v. Sanders*, 556 U.S. 396, 400-01 (2009).

This Court is an Article I tribunal, functioning outside Article III under the "public rights" doctrine. *See Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 432 (2011) (noting that the Court of Appeals for Veterans Claims is an Article I tribunal); *Crowell*, 285 U.S. at 50-51 ("payments to veterans" may be adjudicated outside Article III because they are public rights). And this means that the Court wields executive power, not judicial power under Article III.[3]

---

[2] In *Humphrey's Executor v. United States*, the Supreme Court held that the Federal Trade Commission (FTC) acted as "a legislative agency" and "as an agency of the judiciary" and that, if the FTC exercised any executive function, it did so not using "executive power in the constitutional sense" but "in the discharge and effectuation of its quasi[-]legislative or quasi[-]judicial powers, or as an agency of the legislative or judicial departments of the government." 295 U.S. 602, 628-29 (1935) (relying on *Williams v. United States*, 289 U.S. 553, 567 (1933); *see post* at 21-23 (likewise relying on *Williams*). But as the Supreme Court has observed, the *Humphrey's Executor* view of administrative agency power as non-executive "has not withstood the test of time." *Seila Law*, 140 S. Ct. 2183, 2198 n.2 (2020).

[3] There is ample scholarly support for this conclusion. *See, e.g.*, Michael S. Greve, *Why We Need Federal Administrative Courts*, 28 GEO. MASON L. REV. 765, 800 (2021) ("Technically, the U.S. Tax Court is an executive body, as are the U.S. Court of Federal Claims *and the U.S. Court of Veterans Appeals*. (Not being Article III courts, they cannot be anything else.)" (emphasis added)); William Baude, *Adjudication Outside Article III*, 133 HARV. L. REV. 1511, 1558 (2020) ("[T]ribunals that are justified because they deal with public rights or the military must be part of the executive branch, so while we might colloquially call some of them 'legislative courts,' in the constitutional sense, they are not."); Craig A. Stern, *What's a Constitution Among Friends?—Unbalancing Article*

Our Constitution's separation of powers requires this conclusion. The federal government's power is separated into three types: legislative, executive, and judicial. *INS v. Chadha*, 462 U.S. 919, 951 (1983); *J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 406 (1928); *see generally* THE FEDERALIST NO. 47 (James Madison). The legislative power is vested exclusively in Congress. U.S. CONST. art. I, § 1. And the judicial power is vested in the Supreme Court and such inferior courts as Congress may establish, with the requirement that the judges (or justices) of these courts have lifetime appointments "during good behavior" and are protected from reductions in salary while in office. U.S. CONST. art. III, § 1. Mr. Prewitt does not argue that we exercise legislative power, *see* Pet. at 1-4, nor would such an argument be plausible, given that our authority is limited to "review[ing] decisions of the Board," 38 U.S.C. 7252(a), and we thus lack power to enact any generally applicable laws or regulations. More importantly, we cannot exercise judicial power because "Article III of the Constitution provides that the judicial power of the United States may be vested only in courts whose judges enjoy the [life tenure and salary] protections set forth in that Article." *Stern*, 564 U.S. at 503. And Judges of this Court do not enjoy life tenure. *See* 38 U.S.C. § 7253(c) ("The term of office of the judges of the Court of Appeals for Veterans Claims shall be 15 years.").

Because we wield neither legislative power under Article I nor judicial power under Article III, we must wield executive power under Article II. *Cf. Chadha*, 462 U.S. at 951; *J.W. Hampton*, 276 U.S. at 406; *see City of Arlington*, 569 U.S. at 304 n.4. Thus, contrary to Mr. Prewitt's argument, this Court is not "part of the judicial branch." *See* Pet. at 2. And because the Judges of

---

*III*, 146 U. PENN. L. REV. 1043, 1060-66 (1998) (explaining that "public rights" tribunals exercise executive power rather than "the judicial power of the United States"); Akhil Reed Amar, *Marbury, Section 13, and the Original Jurisdiction of the Supreme Court*, 56 U. CHI. L. REV. 443, 451 n.43 (1989) ("[S]trictly speaking, 'legislative courts' are neither legislative nor courts; rather, they are executive agencies.").

Although the other concurrence plucks an orphaned quote from the Stern article to "solve the puzzle" in a way that "contradicts [the] premise" of this concurrence (not to mention Professor Stern's conclusions), *post* at 27, a closer reading of the article shows no contradiction at all. In Professor Stern's view, the proceedings of public-rights courts are "matter[s] of public administration" that guide the executive branch and inform citizens of their rights and responsibilities. Stern, *supra* at 1062; *accord id.* at 1062 ("Deciding whom to prosecute, what taxes to assess, what grants to disburse, which veterans qualify for benefits—these, and perhaps most, decisions of the executive require applying the law to facts. They are not, however, instances of 'the judicial [p]ower.'") Thus, in Professor Stern's formulation, public-rights tribunals do not "authoritatively pronounce the law" in disputes between parties as Article III courts do; instead, they use executive power to issue binding administrative decisions. *Id* at 1060-66.

And this conclusion also finds support in the legislative history of the statute creating the Court:

An independent Court of Veterans Appeals would be established in the executive branch in lieu of the existing Board of Veterans' Appeals. There are a number of similar executive branch or Article I Courts already in existence; two of the most notable are the Court of Military Appeals and the Tax Court.

H.R. Rep. No. 100-963, pt. 1, at 5 (1988). Although the eventual legislation didn't create the Court "in lieu of" the existing Board of Veterans' Appeals, the legislative history is instructive, nonetheless. And, although the legislation sought to create a Court that is "independent" and "impartial," *see post* at 20-21, acknowledging that we exercise executive power does not undermine our independence conferred by Congress or our ability to decide cases impartially, *see infra* at 10.

this Court are therefore principal officers of the executive branch, appointed by the President and confirmed by the Senate, our review of Board decisions prevents an Appointments Clause violation from occurring due to Board members' appointments by the Secretary; contrary to Mr. Prewitt's premise, Board members do not render "final decision[s] on behalf of the United States" without review by a principal officer in the executive branch. *Arthrex*, 594 U.S. at __, 141 S. Ct. at 1981-82, 1984; *see* 38 U.S.C. §§ 7102(a) 7103(a), 7104(a).

To be sure, some of our decisions have relied on *Freytag v. Commissioner of Internal Revenue* to state that we exercise "the judicial power of the United States." *See, e.g.*, *Rickett v. Shinseki*, 26 Vet. App. 210, 222 (2013) (per curiam order) (en banc), *withdrawn on other grounds*, 27 Vet. App. 240 (2015); *Copeland v. Shinseki*, 26 Vet. App. 86, 90 n.4 (2012); *Jones v. Derwinski*, 1 Vet. App. 596, 607 (1991); *see also Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 889-91 (1991); *post* at 22-24. This reading of *Freytag* is understandable, considering that *Freytag* stated that a non-Article III tribunal—the Tax Court—exercised "the judicial power of the United States." *See Freytag*, 501 U.S. at 891; *see also* Resp. at 7 (agreeing that this Court "has been granted judicial power").

But a continued reading of *Freytag* as concluding that we exercise "the judicial power of the United States" does not appear to survive later Supreme Court decisions specifying that *only* Article III courts possess such power. *See Stern*, 564 U.S. at 484, 503 (holding that "the judicial power of the United States" may be vested only in Article III courts whose judges enjoy lifetime tenure and salary protections). This view was not rejected by *Wellness International Network v. Sharif*, 575 U.S. 665 (2015). *Contra post* at 22 n.24, 24. There, consistent with the public rights doctrine, the Supreme Court simply reiterated that Article I courts may adjudicate certain matters that need not be adjudicated by Article III courts. *See* 575 U.S. at 678-80. The Supreme Court did not hold that Article I courts therefore exercise the judicial power of the United States under Article III. And later Supreme Court decisions have confirmed that only life-tenured Article III judges may exercise such power. *See Oil States Energy Servs., LLC v. Greene's Energy Grp.*, 138 S. Ct. 1365, 1372-73 (2018) ("Congress cannot 'confer the Government's "judicial power" on entities outside of Article III.'" (quoting *Stern*, 546, U.S. at 484)); *see also Ortiz v. United States*, 138 S. Ct. 2165, 2178-80 (2018) (noting that, although Article I military courts have a "judicial character" and perform "an inherently judicial role," they are located within the executive branch).

Moreover, our prior reading of *Freytag* may have been mistaken. As the Court of Appeals for the D.C. Circuit explained in holding that the Tax Court (the same entity examined in *Freytag*) is an executive branch body that exercises executive power, *Freytag* did not use the phrase "judicial power" in "the particular sense employed by Article III" but in "an enlarged sense" encompassing non-Article III adjudications. *Kuretski v. Comm'r of Internal Revenue*, 755 F.3d 929, 941 (D.C. Cir. 2014) (quoting *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 280 (1856) (viewing "judicial power" "in an enlarged sense," holding that all "administrative duties the performance of which involves an inquiry into the existence of facts and the application to them of rules of law" are "judicial act[s]")); *see also Freytag*, 501 U.S. at 908 (Scalia, J. concurring in part) ("'The judicial power,' as the [*Freytag* majority] uses it, bears no resemblance to the constitutional term of art we are all familiar with, but means only, 'the power to adjudicate in the manner of courts.'").

8

Much like the Tax Court, this Court exercises a form of administrative "judicial power" in the sense of examining facts and applying law, but not in the sense of Article III's "judicial power of the United States." Although the other concurrence relies on *Battat v. Commissioner of Internal Revenue*, 148 T.C. 32 (2017), to "persuasively rebut[]" *Kuretski*, *post* at 23-24, *Battat* accomplishes no such thing. Putting aside the relative authoritative value of the Court of Appeals for the D.C. Circuit versus the Tax Court, *Battat* made much the same error that the other concurrence makes here—ignoring the constraints of Article III, Section 1, to assert that an Article I court exercises the judicial power of the United States. *See* 148 T.C. at 53 ("While the Tax Court exercises a portion of the judicial power of the United States, . . . it has jurisdiction to adjudicate only public rights disputes, . . . and thus does not exercise that portion of the judicial power that is reserved for Article III judges."). Contra *Battat*, the Constitution reserves *all* judicial power of the United States to Article III judges. U.S. CONST. art. III, § 1; *Oil States*, 138 S. Ct. at 1372-73; *Stern*, 564 U.S. at 484, 503.

Similarly, although this Court performs adjudicative duties, such as resolving cases; establishing precedents; interpreting the law; awarding attorney's fees; using the Case Management/Electronic Case Files system (which enables courts to maintain electronic files and offer online filing); maintaining practice committees; and hiring court staff, *see post* at 15-20, these duties are not—and indeed cannot be—exercises of the judicial power of the United States under Article III. *See City of Arlington*, 569 U.S. at 304 n.4; *see also Oil States*, 138 S. Ct. at 1378 ("The fact that an agency uses court-like procedures does not necessarily mean it is exercising the judicial power. The Court has rejected the notion that a tribunal exercises Article III judicial power simply because it is 'called a court and its decisions called judgements.'").

Despite the other concurrence's insistence, *Mistretta v. United States* does not support the proposition that this Court exercises the judicial power of the United States. Although *Mistretta* held that the U.S. Sentencing Commission, an independent agency, is in some sense "located in the Judicial Branch," *Mistretta* did not hold that the Sentencing Commission therefore exercises Article III judicial power. *See Mistretta v. United States*, 488 U.S. 361, 393 (1989). Indeed, *Mistretta* squarely held that the Sentencing Commission is an "independent agency" that "*does not exercise judicial power*." *Id.* at 393 (emphasis added); *accord id.* at 408 ("[T]he Commission is not a court and exercises no judicial power."). Thus, any analogy between the Sentencing Commission and this Court, *see post* at 26, confirms rather than rebuts that this Court likewise does not exercise Article III judicial power. Moreover, the existence of a non-judicial administrative body within the judicial branch does not obviate the Constitution's explicit prerequisite of lifetime tenure for a court to wield the judicial power of the United States. *See* U.S. CONST. art. III, § 1.

The other concurrence notes that magistrate and bankruptcy judges are constitutionally permissible as "adjuncts of the district court," *post* at 26, 28, but there is little resemblance between such adjuncts and our Court's Judges. In general, the actions of magistrate judges and bankruptcy judges are constitutionally permissible to the extent that they are subject to the "'total control and jurisdiction'" of district courts. *Wellness Int'l*, 575 U.S. at 677, 679 (quoting *Peretz v. United States*, 501 U.S. 923, 937 (1991)). But we are not subject to any such "total control," and presumably the other concurrence—which emphasizes our "complete[] independen[ce]," *post* at 16—ultimately agrees that we are not mere "adjuncts" of the Article III judiciary.

The other concurrence also argues that there is no present need to consider the Court's location in the constitutional structure because principal officers within VA provide enough oversight of Board decisions to solve any Appointments Clause issues. *See post* at 12-14. After all, the Secretary and the Board Chairman each has some degree of authority over the Board and each is appointed by the President and confirmed by the Senate. *See id*. at 12-14; 38 U.S.C. §§ 303, 7101(b)(1). In my view, this might have been a plausible solution to the Appointments Clause problem before *Arthrex*, but it is no longer tenable because *Arthrex* made clear that an Appointments Clause violation occurs if an officer who has not been nominated by the President and confirmed by the Senate has "power to render a final decision on behalf of the United States" without proper "review" by a "principal officer in the Executive Branch." 594 U.S. at __, 141 S. Ct. at 1981-82, 1988. And here, it is undisputed that both the Secretary and the Board Chairman lack "discretion" to perform the necessary review, and they may not "countermand[]" Board decisions, *id.* at 1982, 1988; indeed, "no principal officer within VA can unilaterally reverse a Board decision," *post* at 14. Without some other executive oversight, this arrangement violates the Appointments Clause under *Arthrex*.

It is true that the Board Chairman may order reconsideration of a decision by a panel of three or more Board members, which may include the Chairman as a single voting member.[4] 38 U.S.C. § 7103; 38 C.F.R. §§ 20.1002, 20.1004 (2022); *see post* at 14. But the Chairman presumably may be outvoted by a panel majority of inferior-officer Board members even if the Chairman orders reconsideration of a case and chooses to sit on the reconsideration panel, leaving the Chairman unable to countermand the decision.[5] *See* 38 C.F.R. § 20.1004; *see also Arthrex*, 594 U.S. at __, 141 S. Ct. at 1981-82, 1988. The Chairman also may assign Board members to proceedings, promulgate performance standards, and award performance incentives, *see* 38 U.S.C. §§ 7101A(c), 7101(e); 38 C.F.R. § 20.106 (2022); *post* at 13-14, but under *Arthrex* these methods of indirectly supervising Board decisions does not solve the Appointments Clauses problem, *see* 594 U.S. at __, 141 S. Ct. at 1980-81.

The Secretary's oversight of individual Board decisions is even narrower and more indirect than the Chairman's. The Secretary's influence over the Board consists of appointing Board members with the approval of the President and removing Board members upon the Chairman's noncertification and recommendation. 38 U.S.C. § 7101A(a)(1), (d)(1); *post* at 13-14. But noncertification and removal do not give the Secretary or the Chairman a "means of countermanding [a] final decision already on the books"—which is "what matters" under *Arthrex*. *see Arthrex*, 594 U.S. at __, 141 S. Ct. at 1981-82. Although VA's internal oversight of the Board may present a closer call than did the Patent Trial and Appeal Board structure that the Supreme found to violate the Appointments Clause in *Arthrex*, I do not think that supervision of the Board

---

[4] The Board may also, on its own or a party's motion, revise a decision based on clear and unmistakable error, 38 C.F.R. §§ 20.1400, 20.1407 (2022), or vacate a decision because due process has been denied or benefits have been granted based on fraudulent evidence, 38 C.F.R. § 20.1000 (2022). But the regulations do not specify any role for the Board Chairman in these actions.

[5] The Chairman can also order reconsideration of a panel decision by the Board, in which instance the case will be referred to "an enlarged panel, consisting of three or more Members than the original panel." 38 C.F.R. § 20.1004(b). But the same potential Appointments Clause problem still exists because it might be ordinary Board members who make the ultimate decision and not the Chairman.

10

from inside VA solves the Appointments Clause problem raised here. Review from this Court, however, does. And that is the ground on which I would reject Mr. Prewitt's motion to recall mandate.

To be clear, acknowledging that this Court exercises executive power in issuing its decisions neither undermines our status as an "independent Article I court," *Kisor v. Wilkie*, 139 S. Ct. 2400, 2409 (2019), nor places the Court's Judges under any executive branch restraint except for the President's narrow power of for-cause removal. *See* 38 U.S.C. § 7253(f). Congress has vested our Court with "exclusive jurisdiction to review decisions of the Board of Veterans' Appeals" and "power to affirm, modify, or reverse a decision of the Board or to remand [a] matter, as appropriate." 38 U.S.C. § 7252(a). Our decisions are reviewable only to the limited extent that Congress has authorized the U.S. Court of Appeals for the Federal Circuit and the Supreme Court to do so. *See* 28 U.S.C. § 1254; 38 U.S.C. § 7292. Acknowledging that we are constitutionally located within the executive branch, as the Supreme Court did in *Arthrex*, does not challenge any aspect of our independence. Nor does it alter Congress's creation of "a court of record to be known as the United States Court of Appeals for Veterans Claims," nor the appointment of "judges" to serve on the Court. 38 U.S.C. §§ 7251, 7253; *see Oil States*, 138 S. Ct. at 1378. Acknowledging that we are constitutionally located in the executive branch simply means that, in our adjudication of cases under authority granted by Congress, we wield executive power and not "the judicial power of the United States."

JAQUITH, *Judge*, concurring: I concur with the Court's opinion that neither issuance of a writ of mandamus nor recall of mandate is warranted in this case. As the Court's opinion provides, this petition is not the appropriate vehicle for addressing Mr. Prewitt's latest constitutional arguments: because his underlying appeal was remanded to the Board, he has an ongoing opportunity to obtain the substantive relief he seeks. The preference for that process is both practical and prudential. "A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them."[6] *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445 (1988); *see, e.g.*, *Bucklinger v. Brown*, 5 Vet.App. 435, 441 (1993). Such restraint recognizes that constitutional questions require the focused consideration of a complete record. As with the petitioner's prior constitutional challenges left for Board consideration,[7] presenting the Board with his argument that the Secretary's appointment of Board members is unconstitutional could result in the Board providing

---

[6] The judicial obligation "to avoid deciding constitutional issues needlessly" applies to separation of powers concerns. *See Christopher v. Harbury*, 536 U.S. 403, 417 (2002).

[7] The Federal Circuit declined "to review Mr. Prewitt's constitutional challenges, which include an Equal Protection claim, a Due Process claim, and a Takings Clause claim," as intertwined with his claims remanded by this Court. *Prewitt v. McDonough*, 856 F. App'x 280, 282-83 (Fed. Cir. 2021). Mr. Prewitt is also pressing his constitutional challenges in U.S. District Court. On September 30, 2022, the U.S. District Court for the District of Columbia denied VA's motion to dismiss Mr. Prewitt's "facial Appointments Clause challenge to the structure of the VA" and his "First and Fifth Amendment challenges to the VJRA's [Veterans' Judicial Review Act's] review system—namely, that it unconstitutionally limits the opportunities for judicial review and court access of an allegedly disproportionately male and nonwhite subgroup." *Prewitt v. McDonough*, No. 4598654, 2022 WL 4598654, at *7-8 (D.D.C. Sept. 30, 2022). The claimant's ability to bring his constitutional challenge in U.S. District Court also demonstrates that he does not lack alternative means of obtaining the relief he seeks. *Dacoron v. Brown*, 4 Vet.App. 115, 119 (1993); *cf. Veterans for Common Sense v. Shinseki*, 678 F.3d 1013, 1033-34 (9th Cir. 2012) (collecting cases).

11

information or analysis useful to the resolution of that argument by this Court.[8] *See Bowling v. McDonough*, 38 F.4th 1051, 1058-59 (Fed. Cir. 2022). So I respectfully disagree with my distinguished concurring colleague's determination that this petition warrants assigning this Court to the executive branch to cure the claimed constitutional infirmity.

In my view, it is backward to concentrate on the cure—and conceive this Court as the Board's executive branch supervisor—without first considering more carefully the claimed constitutional defect: that the Secretary's appointment of Board members violates the Appointments Clause of the U.S. Constitution. The analytical order and volume of my colleague's concurrence seem to reflect recognition that whether there is an Appointments Clause problem is a close question that may be solved by the supervision of the Board within VA.[9] That question is one that should be answered in a case where the decision depends on the answer, is preceded by robust briefing and oral argument, and accounts for this Court's prior precedential decision rejecting an Appointments Clause challenge to Board action when the Court found that the Secretary appoints Board members—inferior officers—in the Secretary's capacity as "Head[] of Department[]." *See Henderson v. West*, 12 Vet.App. 11, 16 (1998) (quoting U.S. CONST. art. II, § 2, cl. 2).

### The Appointments Clause

"The Appointments Clause of the Constitution lays out the permissible methods of appointing 'Officers of the United States,' a class of government officials distinct from mere employees." *Lucia v. S.E.C.*, 138 S. Ct. 2044, 2049 (2018) (quoting U.S. CONST. art. II, § 2, cl. 2). The Appointments Clause provides:

> [The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S. CONST. art. II, § 2, cl. 2."Only the President, with the advice and consent of the Senate, can appoint noninferior officers, called 'principal' officers as shorthand." *United States v. Arthrex, Inc.*, 141 S. Ct. 1970, 1979 (2021). But "Congress may vest the appointment of [inferior] officers 'in the President alone, in the Courts of Law, or in the Heads of Departments.'" *Id.* (quoting U.S. CONST. art. II, § 2, cl. 2).

---

[8] Although the Federal Circuit observed, in the wake of *Carr v. Saul*, 141 S. Ct. 1352 (2021), that the futility exception to the issue exhaustion requirement could apply to an Appointments Clause challenge, the Federal Circuit did not upend this Court's discretion to decline to address an appellant's arguments before they have been presented to the Board. *Morris v. McDonough*, 40 F.4th 1359, 1362-64 (Fed. Cir. 2022). As *Bowling* noted just 20 days before *Morris* was decided, notwithstanding the Board's inability to resolve a constitutional question, the Board can perform "at least record-development functions, as well as associated fact-finding functions." 38 F.4th at 1059.

[9] *Ante* at 9-10.

The Supreme Court has "not set forth an exclusive criterion for distinguishing between principal and inferior officers for Appointments Clause purposes." *Edmond v. United States*, 520 U.S. 651, 661 (1997). However, the basic point is that inferior officers exercise significant authority—the hallmark of an officer—but are supervised at some level by a principal officer or officers, appointed by the President and confirmed by the Senate. *Id.* at 662-63. The statutory and regulatory provisions governing the Board show that its members receive meaningful supervision by principal officers.

### The Department of Veterans Affairs

The Secretary of Veterans Affairs is the head of the Department of Veterans Affairs and is appointed by the President, by and with the advice and consent of the Senate. 38 U.S.C. § 303. "The Secretary is responsible for the proper execution and administration of all laws administered by the Department and for the control, direction, and management of the Department." *Id.* By statute, "[t]he Secretary shall decide all questions of law and fact necessary to a decision by the Secretary under a law that affects the provision of benefits by the Secretary to veterans or the dependents or survivors of veterans." 38 U.S.C. § 511(a). The Secretary is also empowered to provide equitable relief. 38 U.S.C. § 503.

The Secretary is assisted by a Deputy Secretary of Veterans Affairs, who is also appointed by the President, with the advice and consent of the Senate, and serves as Acting Secretary in the absence or disability of the Secretary.[10] 38 U.S.C. § 304.

The Secretary has delegated authority to the Under Secretary for Benefits to act on matters assigned to the Veterans Benefits Administration. 38 C.F.R. § 2.6(b)(1) (2022). The Under Secretary for Benefits is appointed by the President, with the advice and consent of the Senate, and serves as the head of the Veterans Benefits Administration. 38 U.S.C. § 306(b). The Under Secretary for Benefits and supervisory or adjudicative personnel the Under Secretary designates are delegated the authority to make findings and decisions as to the entitlement of veterans and their dependents to benefits under laws administered by VA. 38 C.F.R. § 3.100(a) (2022). In practice, those decisions generally are made by designated personnel at VA's regional offices.[11] *See* 38 U.S.C. § 315.

### The Board of Veterans' Appeals

Appeals of initial decisions on claims go to the Board of Veterans' Appeals, which performs the "one review on appeal to the Secretary" provided by statute. 38 U.S.C. § 7104(a). "The Board is under the administrative control and supervision of a chairman directly responsible to the Secretary." 38 U.S.C. § 7101(a).[12] The Chairman of the Board is appointed by the President, by

---

[10] Other VA officials appointed by the President, with the advice and consent of the Senate, include three Under Secretaries, up to seven Assistant Secretaries, the General Counsel, and the Inspector General. 38 U.S.C. §§ 305-308, 311-12.

[11] VA has 56 regional offices in the United States—at least one in each state and one in the District of Columbia—as well as regional offices in the Philippines and Puerto Rico. *Regional Offices Websites*, VETERANS BENEFITS ADMINISTRATION, https://www.benefits.va.gov/benefits/offices.asp (last visited Oct. 14, 2022.

[12] The Board was created in 1933 by President Franklin D. Roosevelt's Executive Order 6230. Only the titles

and with the advice and consent of the Senate, and the Chairman may be removed by the President. 38 U.S.C. § 7101(b). Board members are "appointed by the Secretary, with the approval of the President, based upon recommendations of the Chairman." 38 U.S.C. § 7101A(a)(1). The Chairman establishes performance standards for Board members and determines whether Board members are awarded performance incentives. 38 U.S.C. §§ 7101A(c), 7101(e). The Chairman also establishes a panel to review the performance of Board members and determine whether they meet performance standards, and the Chairman periodically relies on that determination to recertify each Board member's appointment, grant conditional recertification, or recommend that the Secretary noncertify them. 38 U.S.C. § 7101A(c). "If the Secretary, based upon the recommendation of the Chairman, determines that a member of the Board should be noncertified, . . . that member shall be removed from the Board." 38 U.S.C. § 7101A(d). In addition to removal based on job performance, a Board member "may be removed by the Secretary, upon the recommendation of the Chairman, for any other reason as determined by the Secretary." 38 U.S.C. § 7101A(e).

The Chairman assigns proceedings instituted before the Board to an individual Board member or a panel of Board members. 38 C.F.R. § 20.106 (2022). If the Chairman assigns the appeal to a panel, the Chairman designates one of the Board members as the presiding member. 38 C.F.R. § 20.706 (2022). The Chairman may disqualify a Board member from acting in an appeal where the appeal involves a determination in which the Board member participated or for which the Board member had supervisory responsibility before becoming a Board member, or where other circumstances might give the impression of bias either for or against the appellant. 38 C.F.R. § 20.107 (2022). The Board has a quality review program, aimed at identifying "objective errors that fall outside the bounds of judicial discretion in a uniform and consistent manner," which operates by advising the Board member responsible for the decision and the member's supervising Deputy Vice Chairman so they can remedy the errors. VETERANS BENEFITS MANUAL § 13.6.2 (Nat'l Veterans Legal Servs. Program ed., 2021-2022). The Chairman issues internal memoranda to ensure that Board decisions fulfill the Board's statutory responsibilities, as interpreted by this Court. *See Austin v. Brown*, 6 Vet.App. 547, 549 (1994); *see also Andrews v. McDonough*, 34 Vet.App. 151, 155 (2021); *Clark v. O'Rourke*, 30 Vet.App. 92, 96-97 (2018). In order to grant a benefit, the Chairman may approve the assumption of appellate jurisdiction over an adjudicative determination that has not become final, and the Chairman may order VA Central Office investigations of matters before the Board. 38 C.F.R. § 20.108 (2022). The Chairman has the power to order reconsideration of each Board decision—"on the Chairman's initiative or upon motion of the claimant"—thereby stopping the decision from becoming final. 38 U.S.C. § 7103(a). Such reconsideration must be accomplished by a panel of Board members who were not involved in the prior decision, and the panel may include the Chairman. 38 U.S.C. § 7103(b). Before rendering a decision, the panel must review the entire record before the Board. *Id.* The Chairman reviews the sufficiency of motions for reconsideration and denies motions found insufficient, with notice of the reasons for that finding, or allows motions to be decided by a panel the Chairman assigns, which may include the Chairman. 38 C.F.R. §§ 20.1002, 20.1004 (2022).

<u>An Appointments Clause Violation?</u>

of the Agency and the Secretary have changed since that original empowering order began: "There is hereby created in the Veterans' Administration a Board of Veterans' Appeals under the administrative control and supervision of a chairman directly responsible to the Administrator of Veterans' Affairs."

VA's adjudication of claims for veterans benefits is overseen by principal officers. Regional office personnel designated by a principal officer—the Under Secretary for Benefits—make initial determinations. Board members, also referred to as veterans law judges,[13] decide claimants' appeals, acting in the name of the Secretary who appointed them (with the approval of the President, no less). The Secretary, a principal officer, has the authority to remove Board members for substandard performance or any other reason—"a powerful tool for control." *Edmond*, 520 U.S. at 664. The Chairman, another principal officer, controls their work assignments and performance incentive awards, plays a key role in assessing their performance and deciding whether it warrants their certification to continue to serve on the Board or their removal, and the Chairman has the power to require panel reconsideration of Board members' decisions. And the Secretary may address errors by providing equitable relief. Though no principal officer within VA can unilaterally reverse a Board decision, the meaningful supervision by principal officers goes beyond the supervision that the Supreme Court found inadequate in other contexts in *Edmonds* and *Arthrex*. VA's system provides significant structural safeguards that preserve political accountability through direction and supervision of subordinates—"in other words, through a chain of command." *Arthrex*, 141 S. Ct. at 1982; *see Edmond*, 520 U.S. at 659, 663. The President and public should know where to look if there are concerns: to the Secretary and the Chairman.

My concurring colleague deems removal power and meaningful supervisory control inadequate, interprets *Arthrex* as requiring complete control by the Chairman and/or the Secretary, and therefore finds that only embedding this Court in the executive branch can save VA's structure. I respectfully disagree with his interpretation of *Arthrex* and other Supreme Court precedent. Moreover, *Arthrex* prescribed a different remedy for the error my colleague finds: requiring decisions by administrative law judges to be reviewed (and potentially reversed) by their director. *Arthrex*, 141 S. Ct. at 1986-87.

### The U.S. Court of Appeals for Veterans Claims

My concurring colleague grounds his solution to the problem he sees on a statement by Chief Justice Roberts in *Arthrex*: "[W]hile the Board of Veterans' Appeals does make the final decision within the Department of Veterans Affairs . . . its decisions are reviewed by the Court of Appeals for Veterans Claims, an Executive Branch entity." 141 S. Ct. at 1984. That statement is dictum—made in a judicial opinion but "unnecessary to the decision in the case and therefore not precedential."[14] *Dictum*, BLACK'S LAW DICTIONARY 569 (11th ed. 2019). The authority cited for that statement, *Henderson v. Shinseki*, 562 U.S. 428, 431-32 (2011), does not support it. *Henderson* says nothing of the branch to which this Court belongs, only that this Court is "an Article I tribunal" with a scope of review "similar to that of an Article III court." 562 U.S. at 432 n.2. As will be detailed, the similarities are extensive enough to denote a familial relationship. And that is the

---

[13] *See* 38 C.F.R. § 20.101(b) (2022).

[14] *Arthrex* concerned the appointments of administrative patent judges and the Patent Trial and Appeal Board. 141 S. Ct. at 1976. The process for VA's administrative adjudication of veterans claims and the independent judicial review of Board of Veterans' Appeals decisions by this Court were not at issue. The danger of dictum is that, though it is not binding, it "give[s] the appearance of carrying the cloak of judicial acceptance." *Lasovick v. Brown*, 6 Vet.App. 141, 153 (1994) (Ivers, J., concurring in part, dissenting in part). But "[d]ictum settles nothing, even in the court that utters it." *Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 352 n. 12 (2005).

answer to the Chief Justice's concern, expressed in dissent in *City of Arlington v. FCC*, 569 U.S. 290, 312-15 (2013), that the pervasive accumulation of legislative, executive, and judicial powers in the same branch endangers the separation of powers that safeguards liberty. The *City of Arlington* majority responded:

> Agencies make rules ("Private cattle may be grazed on public lands X, Y, and Z subject to certain conditions") and conduct adjudications ("This rancher's grazing permit is revoked for violation of the conditions") and have done so since the beginning of the Republic. These activities take "legislative" and "judicial" forms, but they are exercises of—indeed, under our constitutional structure they must be exercises of—the "executive Power."

*Id.* at 305 n.4. That statement puts the Chief Justice's understandable "discomfort with the growth of agency power" in perspective. *Id.* The *City of Arlington* majority's description of agency power covers VA and the Board, but not this Court, which is not part of the agency but a completely independent court of record. The actual creation, structure, and function of this Court do not support *Arthrex's* sidebar characterization.

## The Court's Structure

The statute that established our Court describes it as "a court of record . . . known as the United States Court of Appeals for Veterans Claims." 38 U.S.C. § 7251. The statute covering the creation of the circuit courts of appeals provides that each circuit court shall be "a court of record, known as the United States Court of Appeals for the circuit." 28 U.S.C. § 43(a). The U.S. District Court for each district also is a court of record. 28 U.S.C. § 132(a).

Circuit judges, district judges, and the nine Judges of this Court are "appointed by the President, by and with the advice and consent of the Senate." 28 U.S.C. §§ 44(a), 133(a); 38 U.S.C. § 7253. Circuit judges, district judges, and Judges of this Court are subject to residence requirements and receive salaries set by statute, 28 U.S.C. §§ 44, 134; 38 U.S.C. § 7253.[15] Each court has a chief judge, generally chosen based on seniority. 28 U.S.C. §§ 45, 136; 38 U.S.C. § 7253. District judges and circuit judges "hold office during good behavior," 28 U.S.C. §§ 44, 134. Each of this Court's nine Judges is appointed for a term of 15 years and may be removed by the President for misconduct or neglect of duty, with any judicial discipline tied to the process for circuit and district courts that goes through the Judicial Conference, as spelled out in 28 U.S.C. §§ 354(b)-361. 38 U.S.C. § 7253(g). Circuit judges, district judges, and the nine Judges of this Court may retire when they meet certain age and service requirements—which are the same for each court. 28 U.S.C. § 371; 38 U.S.C. § 7296(b). For all three courts, retired judges who continue to work the equivalent of 3 months each year continue to receive the salary of the office, and those who do not continue to work receive retired pay at the rate of pay applicable at the time of retirement. 28 U.S.C. § 371; 38 U.S.C. § 7257. At this Court, retired judges who give notice of their availability for further service and their willingness to be recalled may be recalled for further

---

[15] Judges of this Court are salaried "at the same rate as is received by judges of the United States district courts." 38 U.S.C. § 7253.

16

service and "exercise all of the judicial powers and duties of the office of a judge in active service." 38 U.S.C. § 7257.

Pursuant to 38 U.S.C. § 7264(a) and 28 U.S.C. § 2071, the Court has prescribed rules of practice and procedure, as well "E-Rules" regarding the Court's use of the federal judiciary's automated system for case management and document filing, known as CM/ECF, which stands for Case Management/Electronic Case Filing. *See* U.S. VET. APP. R. 1-49. The Court also has constituted a Committee on Admission and Practice, Rules Advisory Committee, and Judicial Advisory Committee. U.S. VET. APP. R. 2, 40; Misc. Order 04-17.

The Court has the power to punish by fine or imprisonment contempt of its authority. 38 U.S.C. § 7265(a). The statute specifically lists

(1) misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice;
(2) misbehavior of any of its officers in their official transactions; or
(3) disobedience or resistance to its lawful writ, process, order, rule, decree, or command.

*Id.* And "[t]he Court shall have such assistance in the carrying out of its lawful writ, process, order, rule, decree, or command as is available to a court of the United States." 38 U.S.C. § 7265(b). The U.S. Marshals Service provides such assistance, as well as judicial security.

The Court is authorized to hold judicial conferences involving the Judges of the Court, persons admitted to practice before the Court, and others active in the legal profession, "for the purpose of considering the business of the Court and recommending means of improving the administration of justice within the Court's jurisdiction." 38 U.S.C. § 7286. The Court is also authorized to impose a reasonable registration fee for participation in its judicial conferences, as well as "a reasonable periodic registration fee on persons admitted to practice before the Court." 38 U.S.C. § 7285.

In matters of ethics and financial disclosure, the Judges of this Court are listed in the definition of "judicial officer," and employees of this Court at a described pay rate are "judicial employees," 5 U.S.C App. 4 §§ 101(f)(10), 101(f)(11), 109(8), 109(10)—and not as officers or employees in the executive branch, 5 U.S.C App. 4 § 101(f)(3)—and the "supervising ethics office" for the judicial officers and judicial employees of this Court is the Judicial Conference of the United States, 5 U.S.C App. 4 § 109(18), which administers the provisions of the Ethics in Government Act for the judicial officers and judicial employees of this Court. 5 U.S.C App. 4 § 111. With respect to taxing property sales, the tax code likewise defines Judges of this Court as "judicial officers," rather than as officers of the executive branch, for purposes of promoting compliance with conflict-of-interest requirements. 26 U.S.C. § 1043(b)(6).

Because this Court is, well, a court and not an agency in the executive branch, it is not subject to the Freedom of Information Act, which defines "agency" as not including "the courts of the United States." 5 U.S.C. § 551(1)(B); *see* 5 U.S.C. § 552(f)(1); *Megibow v. Clerk of U.S. Tax Ct.*, No. 04 CIV. 3321 (GEL), 2004 WL 1961591, at *4 (S.D.N.Y. Aug. 31, 2004) ("Congress has

17

left no doubt about the Tax Court's institutional nature [as a court] . . . and any contention that [legislative courts[16]] really constitute executive agencies of the sort to which FOIA applies would be baseless."), *aff'd*, 432 F.3d 387 (2d Cir. 2005). And the Judges of this Court—like Article III judges—have absolute immunity from liability for damages for acts committed in their judicial capacity. *See AV2 v. McDonough*, No. CV 22-369, 2022 WL 1173180, at *8 (E.D. Pa. Apr. 20, 2022) (military judge); *Chisum v. Colvin*, 276 F. Supp. 2d 1, 3 (D.D.C. 2003) (Tax Court judge).

The Court has, by statute, a Clerk of Court, deputies, law clerks, secretaries, and other employees, all able to be appointed "without regard to the provisions of title 5 governing appointments in the competitive service." 38 U.S.C. § 7281(a)-(c). The statute empowers the Court to fix the rates of pay for these employees without regard to executive branch limitations and provides that, "[t]o the maximum extent feasible, the Court shall compensate employees at rates consistent with those for employees holding comparable positions in the judicial branch." 38 U.S.C. § 7281(d). Similar to the funding for Article III courts, this Court has a separate budget it submits "for inclusion in the budget of the President . . . without review within the executive branch." 38 U.S.C. § 7282(a). To ensure that the Court stands on equal footing with other federal courts, a statute specifically provides that the Court "may exercise, for purposes of management, administration, and expenditure of funds of the Court, the authorities provided for such purposes by any provision of law . . . applicable to a court of the United States (as that term is defined in section 451 of title 28)." 38 U.S.C. § 7287.

### The Court's Function

This Court's function and powers are "quintessentially judicial." *Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 891 (1991). The Court has "exclusive jurisdiction to review [final] decisions of the Board of Veterans' Appeals." 38 U.S.C. § 7252. Similarly, circuit courts of appeals "have jurisdiction of appeals from all final decisions of the district courts."[17] 28 U.S.C. § 1291. Like a district court, the Board conducts hearings and engages in factfinding—albeit from within the executive branch agency responsible for resolving the claims at issue. *See* 38 U.S.C. § 7107(c). Like a circuit court, this Court conducts appellate review based on the record. 38 U.S.C. § 7252(b). Decisions of this Court are subject to review by the Federal Circuit. 38 U.S.C. §§ 7252(c), 7292.

From its inception, this Court has reviewed the record of proceedings on claims by veterans and their family members before VA and the Board of Veterans' Appeals and rendered binding judicial opinions, decisions, and orders that

(1) decide all relevant questions of law, interpret constitutional, statutory, and regulatory provisions, and determine the meaning or applicability of the terms of an action of the Secretary;
(2) compel action of the Secretary unlawfully withheld or unreasonably delayed;

---

[16] Courts created by Congress pursuant to Article I are sometimes referred to as "legislative courts" to reflect the nature of their birth. No one contends that such courts perform legislative functions or are part of the legislative branch.

[17] Of course, the jurisdiction of each circuit court of appeals is regional, while this Court's jurisdiction is nationwide.

(3) hold unlawful and set aside decisions, findings . . . , conclusions, rules, and regulations issued or adopted by the Secretary, the Board of Veterans' Appeals, or the Chairman of the Board found to be—
  (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
  (B) contrary to constitutional right, power, privilege, or immunity;
  (C) in excess of statutory jurisdiction, authority, or limitations, or in violation of a statutory right; or
  (D) without observance of procedure required by law; and
(4) In the case of a finding of material fact adverse to the claimant made in reaching a decision in a case before the Department with respect to benefits under laws administered by the Secretary, hold unlawful and set aside or reverse such finding if the finding is clearly erroneous.

38 U.S.C. § 7261.

In fiscal year 2021, the total number of dispositions by the Court as a whole—including decisions on appeals, petitions, applications under the Equal Access to Justice Act, and requests for reconsideration or decision by a three-judge panel—was 17,002. *See* U.S. CT. OF APPEALS FOR VETERANS CLAIMS, FISCAL YEAR 2021 ANN. REP., http://www.uscourts.cavc.gov/report.php. An early case highlighted "the binding effect of this Court's published opinions as precedent in pending and future cases," *Harrison v. Derwinski*, 1 Vet.App. 438, 438 (1991), citing *Webster v. Reproductive Health Services*, 492 U.S. 490, 518 (1989), for the proposition that "stare decisis is a cornerstone of our legal system." And my concurring colleague has emphasized that "[s]tare decisis . . . the idea that today's Court should stand by yesterday's decisions—is "'a foundation stone of the rule of law.'" *Ravin v. Wilkie*, 31 Vet.App. 104, 118 (2019) (Falvey, J., dissenting) (quoting *Kimble v. Marvel Ent.*, 576 U.S. 446, 455 (2015)). In contrast, Board decisions are not precedential. 38 C.F.R. § 20.1304 (2022).

"Although not an Article III court, this Court has adopted the case-or-controversy requirement as a basis for exercising our exclusive jurisdiction in the veterans benefits arena, *see* 38 U.S.C. § 7252, including the requirement that a case be dismissed when it becomes moot during the course of the appeal." *Cardona v. Shinseki*, 26 Vet.App. 472, 474 (2014); *see Mokal v. Derwinski*, 1 Vet.App. 12, 15 (1990) (adopting "the jurisdictional restrictions of the Article III case or controversy rubric").

The statute spelling out the scope of our review specifies that this Court's mandate includes interpreting constitutional provisions and holding unlawful and setting aside decisions, regulations, and the like issued or adopted by the Secretary, the Chairman of the Board, or the Board found to be "contrary to constitutional right, power, privilege, or immunity." 38 U.S.C. § 7261(a)(1), (3). In addition, "[t]he Court's authority to find a statute unconstitutional is well settled by precedential decisions of the Court," recognized by other federal appellate courts, reflected in the legislative history of the establishment of the Court, and "'inherent in the Court's status as a Court of law.'" *Copeland v. Shinseki*, 26 Vet.App. 86, 90 n.4 (2012) (collecting cases and quoting *Dacoron*, 4 Vet.App. at 119).

19

The statute that provides for the award of attorney fees under the Equal Access to Justice Act has, for 30 years, specified that this Court is a court that can make such awards. 28 U.S.C. § 2412(d)(2)(F) ("'[C]ourt' includes . . . the United States Court of Appeals for Veterans Claims"). As this Court has chronicled,

> "'[t]he objective of EAJA is to eliminate financial deterrents to individuals attempting to defend themselves against unjustified government action. Veterans are among the types of individuals the statute was intended to help.'" *Abbs v. Principi*, 237 F.3d 1342, 1347 (Fed. Cir. 2001) (quoting H.R. Rep. No. 102-1006, at 25 (1992), 1992 U.S.C.C.A.N.[] 3921, 3934). "EAJA applies, and its central policy is of particular significance, in the 'uniquely pro-claimant' system for adjudicating veterans' claims for benefits" because EAJA "'helps to ensure that [veterans] will seek an appeal when the [Department of Veterans Affairs] has failed in its duty to aid them or has otherwise erroneously denied them the benefits that they have earned.'" *Wagner v. Shinseki*, 733 F.3d 1343, 1344 (Fed. Cir. 2013) (alterations in original) (quoting *Kelly v. Nicholson*, 463 F.3d 1349, 1353 (Fed. Cir. 2006)).

*Froio v. McDonald*, 27 Vet.App. 352, 355–56 (2015)

In 2017, the Federal Circuit held that this Court has the authority to certify and adjudicate class action cases "under the All Writs Act, other statutory authority, and the . . . Court's inherent powers." *Monk v. Shulkin*, 855 F.3d 1312, 1318 (Fed. Cir. 2017). The Court also has the power to issue a writ of mandamus and all writs appropriate in aid of our jurisdiction and our prospective jurisdiction where failure to act "would forever frustrate the ability of [this Court] to exercise its appellate jurisdiction.'" *Love v. McDonough*, 35 Vet.App. 336, 342 (2022) (quoting *Erspamer v. Derwinski*, 1 Vet.App. 3, 8 (1990)). "The [All Writs Act] 'permits federal courts to fill gaps in their judicial power where those gaps would thwart the otherwise proper exercise of their jurisdiction.'" *Gardner-Dickson v. Wilkie*, 33 Vet.App. 50, 55 (2020) (quoting *Monk*, 855 F.3d at 1318).

If the foregoing is not enough, the United States officially lists this Court in the judicial branch. *The United States Government Manual*, published by the Office of the Federal Register, National Archives and Records Administration, describes this Court as one of the "Special Courts" within the judicial branch.[18] The official website of the U.S. Government, www.usa.gov, lists the Government branch of this Court as "Judicial." [19]

<u>Legislative History</u>

---

[18] OFF. OF THE FED. REG., NAT'L ARCHIVES & RECS. ADMIN., THE UNITED STATES GOVERNMENT MANUAL 166 (2021), https://www.govinfo.gov/content/pkg/GOVMAN-2021-12-22/pdf/GOVMAN-2021-12-22.pdf.

[19] *See U.S. Court of Appeals for Veterans Claims*, https://www.usa.gov/federal-agencies/u-s-court-of-appeals-for-veterans-claims (last accessed Oct. 19, 2022). USA.gov is the federal internet portal established pursuant to the E-Government Act of 2002; it is administered by a division of the U.S. General Services Administration's Technology Transformation Services.

The other concurrence misapprehends the legislative history of the Veterans' Judicial Review Act (VJRA).[20] The portion of that history my concurring colleague recites—the proposal to establish this Court in the executive branch in place of the Board—was *rejected* in a sea change that resulted in the creation of the independent court providing judicial review from *outside* the executive branch agency. That outcome was a compromise by Representatives who favored the intra-executive branch proposal the other concurrence cites, and by Senators who favored sending veterans' cases to the district or circuit courts. In the words of a principal sponsor in the House: "[W]e have crafted a compromise bill which will allow an independent review by a court of the VA's decision on a veteran's claim." 134 CONG. REC. 31770 (1988). Another Representative noted that "[t]he specialty court will be an independent, impartial body." 134 CONG. REC. 31790. Yet another said the new Court, "as a judicial tribunal, has the authority to establish its own rules of practice and procedure" and "has full judicial standing, including authority to issue and enforce its judicial decrees and writs . . . like any other U.S. court." 134 CONG. REC. 31788.

A Senate sponsor said independent judicial review was required because

[f]undamental principles of due process, as guaranteed by the Constitution, require an independent review of administrative action affecting individual's liberty or property interests. Although there are earlier court decisions suggesting that veterans' benefits are gratuities and not worthy of general due process protections, such a viewpoint is no longer valid, if it ever was, either philosophically—veterans' benefits are earned by military service—or legally. A number of decisions rendered by the Supreme Court in the last two decades . . . have held that various statutory governmental benefits are legal entitlements and, thus, protected property interests of the beneficiary. I do not believe that review by the Board of Veterans' Appeals provides the required independent action required by due process.

134 CONG. REC. 31465-66.

The budget provision now codified at 38 U.S.C. § 7282 was an effort to ensure the independence of the Court by providing that the Court's budget be submitted by the Court to Congress "without any review within the executive branch . . . . [to] enable the court to conduct its business without the specter of executive branch influence over or involvement in its proceedings." 134 CONG. REC. 31470.

Some in Congress were even more direct about their branch expectations. One Representative supported the compromise bill to "guarantee the veteran actual judicial review of all VA decisions" and guarantee accountability in that the "Constitution clearly defined the role of the three branches of our Government and provided for court review of actions by the other two branches. With this right comes the right that any individual citizen has to go to court and seek a review." 134 CONG. REC. 27792. And a Senator similarly said:

To me it is unacceptable to deny veterans, their dependents and their survivors the basic protection of the independent judicial branch of our Government. S. 11 will

---

[20] *Ante* at 6 n.3.

correct the current shortcomings and ensure that veterans and other claimants before the VA receive all benefits to which they are entitled under the law.

134 CONG. REC. 31224.

## Article I Judicial Power of the United States

My concurring colleague notes that administrative agency power is executive power.[21] Just so, but any implication that this Court exercises administrative agency power completely misses the mark. Next he contends of this Court that "[b]ecause we wield neither legislative power under Article I nor judicial power under Article III, we must wield executive power under Article II."[22] That jumbles the power structure the Supreme Court described with a rhetorical question in 1933: "If the power exercised by legislative courts is not judicial power, what is it? Certainly it is not legislative, or executive, or administrative power, or any imaginable combination thereof." *Williams v. United States*, 289 U.S. 553, 567 (1933). And *Williams* traced the lineage of its holding that "judicial power apart from [Article III] may be conferred by Congress upon legislative courts" to "the opinion of Chief Justice Marshall in *American Insurance Company et al. v. Canter*, 1 Pet. 511, 546, 7 L. Ed. 242 [1828]." *Williams*, 289 U.S. at 565. Lest this principle be thought lost in the dustbin of history, it was fully embraced in *Freytag* as

> [the Supreme] Court's time-honored reading of the Constitution as giving Congress wide discretion to assign the task of adjudication in cases arising under federal law to legislative tribunals . . . [The Supreme Court's] cases involving non-Article III tribunals have held that *these courts exercise the judicial power of the United States*.

*Freytag*, 501 U.S. at 889 (emphasis added).

For more than 30 years, this Court has relied on *Freytag* to state that we exercise "the judicial power of the United States." *Jones v. Derwinski*, 1 Vet.App. 596, 607 (1991); *see, e.g.*, *Dacoron*, 4 Vet.App. at 119 ("[This Court's] power to review claims pertaining to the constitutionality of statutory and regulatory provisions. . . . is inherent in the Court's status as a court of law."); *Copeland*, 26 Vet.App. at 90 n.4 (highlighting "our duty as a Court exercising judicial power" to address constitutional issues); *Rickett v. Shinseki*, 26 Vet.App. 210, 222 (2013) (per curiam order) (en banc), withdrawn on other grounds, 27 Vet.App. 240 (2015). In *Rickett*, this Court noted that "a judicial appeal and its adversarial process . . . [are] decidedly not within VA," and explained: "Indeed, VA is an executive branch agency and the Secretary is an adverse party in litigation before the Court, which exercises the judicial power of the United States." 26 Vet.App. at 222.

There is no sound reason to disregard either these precedential decisions by our Court or the Supreme Court's decision in *Freytag*. My concurring colleague posits that *Freytag* "does not

---

[21] *Ante* at 6 nn.2, 7.

[22] *Ante* at 7.

22

appear to survive later Supreme Court decisions," citing *Stern v. Marshall*.[23] He emphasizes the observation in *Stern* that "Article III of the Constitution provides that the judicial power of the United States may be vested only in courts whose judges enjoy the protections set forth in that Article." *Stern v. Marshall*, 564 U.S. 462, 503 (2011).[24] Based on that view, the Supreme Court concluded that Congress exceeded its constitutional authority by empowering the Bankruptcy Court "to enter a final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim." *Id*. But *Stern* does not even mention *Freytag*, much less overrule it. And the expansive *Stern* view of the exclusivity of Article III (upon which my colleague relies) did not prevail in the next Supreme Court case to consider the subject in the bankruptcy context.[25]

In more than three decades, *no* Supreme Court case has overruled *Freytag* or even expressly questioned it. *Arthrex* endorses *Freytag* as an example of a proper appointment and adjudication plan. 141 S. Ct. at 1984. To be sure, the other concurrence may accurately predict that a decision affirmatively segregating Article III judges from Article I judges is coming someday. None of the Supreme Court Justices that decided *Freytag* are on the Court now, and some current Justices have embraced Justice Scalia's partial concurrence in *Freytag,* rather than the majority opinion.[26] *See, e.g.*, *Ortiz v. United States*, 138 S. Ct. 2165, 2192 (2018) (Alito, J. dissenting); *Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 138 S. Ct. 1365, 1374, 1378 (2018). *Oil States* provides more opacity than clarity, noting the Supreme Court's inconsistency in public rights cases and adding some of its own—echoing the *Stern* proposition that "Congress cannot 'confer the Government's judicial Power on entities outside Article III,'" but holding that agency board adjudication of a patent dispute was permissible because the board did not exercise Article III judicial power, citing *Williams*. 138 S. Ct. at 1372-73, 1378. *Williams* held that "judicial power apart from [Article III] may be conferred by Congress upon legislative courts," 289 U.S. at 565, so it was not surprising that the Chief Justice joined a dissent contending that the *Oil States* majority had not really applied *Stern*. *Oil States*, 138 S. Ct. at 1381. The *Ortiz* majority follows *Freytag* (without citing it) by recognizing that military courts, like territorial courts, exercise judicial power, just not under Article III.[27] 138 S. Ct. at 2175-78. *Arthrex* and *Stern* were decided by the slimmest of margins. What should be determinative is not foresight but fidelity to standing precedent—*Freytag*—and to the principle of independent judicial review upon which both our Nation and this Court were founded.

---

[23] *Ante* at 8.

[24] *See id.*

[25] In *Wellness International Network, Ltd. v. Sharif*, the Supreme Court observed that "[a]n expansive reading of *Stern* . . . would be inconsistent with the opinion's own description of its holding," which the *Stern* court said was a narrow one that did not change much. 575 U.S. 665, 682 (2015). Dissenting from the *Wellness* holding that "Article III permits bankruptcy courts to decide *Stern* claims submitted to them by consent," *id.* at 685, Chief Justice Roberts declared that Article III's life tenure and salary protection was a structural safeguard that must be guarded even against consent. *Id.* at 688.

[26] My concurring colleague also prefers and relies on Justice Scalia's *Freytag* concurrence. *Ante* at 8.

[27] *See also Fin. Oversight & Mgmt. Bd. for P.R. v. Aurelius Inv., LLC*, 140 S. Ct. 1649, 1659, 1664 (2020) (first citing *Am. Ins. Co. v. 356 Bales of Cotton*, 26 U.S. 511, 546 (1828); then citing *Palmore v. United States*, 411 U.S. 389, 407 (1973)) (providing that "territorial courts may exercise the judicial power of the Territories,", and the Article I court for the District of Columbia exercises local judicial power).

My colleague also throws shade on *Freytag* by endorsing the interpretation of it in *Kuretski v. Commissioner of Internal Revenue*. Rejecting a taxpayer's erroneous assertion that Tax Court judges exercise Article III judicial power, *Kuretski* said that the *Freytag* Court "used the phrase 'judicial power' in 'an enlarged sense,' not in the particular sense employed by Article III." 755 F.3d 929, 941 (D.C. Cir. 2014). The use of the words "in 'an enlarged sense'" might be a fair characterization of *Freytag* if *Kuretski*—and then my colleague—did not define "'in an enlarged sense'" as encompassing "'all those administrative duties the performance of which involves an inquiry into the existence of facts and the application to them of rules of law.'" *Kuretski*, 755 F.3d at 941 (quoting *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 280 (1855)).[28] That definition distorts and diminishes *Freytag*. The "enlarged sense" characterization comes from Justice Scalia's partial concurrence, not the majority opinion. *Freytag*, 501 U.S. at 909-10 (Scalia, J., concurring in part). The *Freytag* holding quite specifically and thoroughly sets out that Article I courts, such as the Tax Court, that perform exclusively judicial functions exercise the judicial power of the United States and are "Courts of Law" within the meaning of the Appointments Clause. *Id.* at 888-92. *Freytag* thus covers this Court, as we have previously held.[29]

Moreover, the Tax Court persuasively rebutted *Kuretski* in *Battat v. Commissioner of Internal Revenue*, describing in detail the Tax Court's exclusively judicial function and embracing the *Freytag* holding that the Tax Court exercises only judicial power (and not executive power).[30] 148 T.C. 32, 36-48, 59 (2017). The *Battat* Court declared: "While the Tax Court exercises a portion of the judicial power of the United States, . . . it has jurisdiction to adjudicate only public rights disputes, . . . and thus does not exercise that portion of the judicial power that is reserved for Article III judges." *Id.* at 53. So it is with this Court. And this Court has an even clearer hold on the portion of the judicial power of the United States under Article I because this Court did not originate as a board that was designated as an agency in the executive branch. *Cf. id.* at 34-35.

In *Wellness*, the Supreme Court emphasized the importance of determining whether there was impermissible encroachment that threatened the institutional integrity of the judicial branch by looking to the practical effect of the congressional exercise of its Article I powers, rather than "'formalistic and unbending rules.'" 575 U.S. at 678-80 (quoting *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 851 (1986)). The *Schor* factors *Wellness* embraced and applied included the extent to which the Article I court "exercises the range of jurisdiction and powers normally vested only in Article III courts, the origins and importance of the right to be adjudicated, and the concerns that drove Congress to depart from the requirements of Article III.'" *Wellness*, 575 U.S. at 678-79 (quoting *Schor*, 478 U.S. at 851).

---

[28] *Ante* at 8.

[29] *Supra* at 22.

[30] As *Battat* highlighted, *Kuretski* also was wrong to equate the Tax Court with the Court of Appeals for the Armed Forces (CAAF). 148 T.C at 40-41 n.15. In *Edmond*, the Supreme Court noted that the Uniform Code of Military Justice states that Court of Appeals for the Armed Forces is "located for administrative purposes only in the Department of Defense" and "its judges must meet annually in committee with the Judge Advocates General and two members appointed by the Secretary of Defense to survey the operation of the military justice system," 520 U.S. at 665 (quoting 10 U.S.C. §§ 941, 946). *See also Ortiz*, 138 S. Ct. at 2176 ("Congress located the CAAF . . . within the Executive Branch, rather than the judicial one.").

Measured against these *Wellness/Schor* factors, it is clear that the creation of this Court and its judicial power do "not usurp the constitutional prerogatives of Article III courts." *See Wellness*, 575 U.S. at 679. Our jurisdiction is narrowly limited to the independent judicial review of final decisions of the Board regarding veterans benefits claims. The system that Congress created for the adjudication of veterans claims "is strongly and uniquely pro-claimant," *Hodge v. West*, 155 F.3d 1356, 1362 (Fed. Cir. 1998), and dramatically more protective of veterans rights than the construct for ordinary civil litigation. *Henderson v. Shinseki*, 562 U.S. at 440. These systemic choices reflect national gratitude for the "the special sacrifices made by veterans of military service." *Johnson v. Robison*, 415 U.S. 361, 381 n.15 (1974). The longstanding solicitude of Congress for veterans, *see United States v. Oregon*, 366 U.S. 643, 647 (1961), is reflected in "laws that 'place a thumb on the scale in the veteran's favor in the course of administrative and judicial review of VA decisions.'" *Henderson*, 562 U.S. at 440 (quoting *Shinseki v. Sanders*, 556 U.S. 396, 416 (2009) (Souter, J., dissenting)).

Nothing indicates that by creating a means of independent judicial review of VA decisions, Congress sought to aggrandize itself, humble the judiciary, or emasculate constitutional courts. *See Wellness*, 575 U.S. at 679-80; *Schor*, 478 U.S. at 850. Quite the contrary. The statutory choices and legislative history reflect that Congress wanted to afford veterans, their dependents, and survivors due process through court review by the independent judicial branch and consequently established a specialty court to provide that review with a focus that would facilitate expeditious resolution, consistency, and the development of expertise and would not overburden district and circuit courts.

## The Judicial Branch

The foregoing demonstrates and other cases have affirmed that this Court provides judicial review from outside the executive branch. *See George v. McDonough*, 142 S. Ct. 1953, 1957 (2022) ("If the Board . . . denies relief, the veteran may seek further review *outside the agency*" by appealing to this Court. (emphasis added)); *Romero v. Tran*, 33 Vet.App. 252, 259 (2021) (noting, in applying the presumption of regularity, that the presumption's rationale includes separation of powers and the judiciary's conscious effort not to intrude on the executive branch's operations without good cause); *Ravin*, 31 Vet.App. at 124 (Falvey, J., dissenting) (citing with approval a prior criticism of the Court for departing from "'judicial review of policies established by the popularly-elected and therefore publicly accountable legislative and executive branches'" (quoting *Carpenter v. Principi*, 15 Vet.App. 64, 81 (2001))); *DeBeaord v. Principi*, 18 Vet.App. 357, 368 (2004) (holding that the Court could not rewrite a statute, as the appellant sought, because that remedy was "within the province of the legislative and executive branches, which, respectively, make and execute the laws"); *Werden v. West*, 13 Vet.App. 463, 468 (2000) ("[T]he Court does not have jurisdiction to review the manner in which the Secretary disburses [the special adaptive housing] grant. . . . [because that] is exactly the type of question of policy or resource management that is made by the executive branch and is not an appropriate matter for judicial review.").

One justification for Article I courts that has long been recognized distinguishes private lawsuits at common law from those involving public rights "which arise between the Government and persons subject to its authority," such that Congress completely controls whether to "reserve

to itself the power to decide, . . . delegate that power to executive officers, or . . . commit it to judicial tribunals." *Crowell v. Benson*, 285 U.S. 22, 50-51 (1932). Providing a familiar illustration of an administrative agency Congress created to determine a public right, *Crowell* highlighted the congressional power to regulate payments to veterans.[31] *Id.* at 51 That truth covers the Board—as an arm of VA, an administrative agency in the executive branch—but only begins the consideration that leads to a different conclusion for this Court. *Crowell* recognized that such consideration properly looks not merely to form but to substance. 285 U.S. at 53. "The enduring lesson of *Crowell* is that practical attention to substance rather than doctrinaire reliance on formal categories should inform application of Article III."[32] *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 587 (1985).

My concurring colleague opts for "doctrinaire reliance on formal categories" over substance by contending that this Court's status as an Article I tribunal "means that the Court wields executive power" rather than judicial power, and therefore cannot be in the judicial branch.[33] But the Supreme Court has made clear that the judicial branch includes more than just Article III judges. Neither bankruptcy judges nor magistrate judges enjoy Article III tenure and salary protections, but both serve in the judicial branch as adjuncts of the district court. *See Wellness*, 575 U.S. at 668; *N. Pipeline Const. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 77 (1982); 28 U.S.C. §§ 152(a) (a "bankruptcy judge shall be appointed for a term of 14 years"), 631(e) ("The appointment of any individual as a full-time magistrate judge shall be for a term of eight years."). Moreover, in 1989, the Court held that there was "no separation-of-powers impediment to the placement of the Sentencing Commission within the Judicial Branch." *Mistretta v. United States*, 488 U.S. 361, 390 (1989). The Court looked to constitutional framer James Madison's recognition "that our constitutional system imposes upon the [b]ranches a degree of overlapping responsibility, a duty of interdependence as well as independence" to govern effectively. *Id.* at 381. Though the Sentencing Commission is composed of judges and non-judges, the Court observed that it had previously recognized Congress's power to create similar entities with mixed staffs, including the Judicial Conference of the United States, the Rules Advisory Committees, and the Administrative Office of the United States Courts (whose responsibilities include the administration of the entire U.S. Probation Service). *Id.* at 388-89. Though the Sentencing Commission wields rulemaking power rather than adjudicatory power, the Court found that the nature of the Commission's work was related and "not incongruous or inappropriate" to that of the judicial branch. *Id.* at 396.

The *Mistretta* Court also observed that the judges who served as commissioners would wield administrative, rather than judicial, power. *Id.* at 404. And the Court found that the

---

[31] The Chief Justice's dissent in *Wellness* agreed:

With narrow exceptions, Congress may not confer power to decide federal cases and controversies upon judges who do not comply with the structural safeguards of Article III. Those narrow exceptions permit Congress to establish non-Article III courts to . . . adjudicate disputes over "public rights" such as veterans' benefits.

575 U.S. at 689-90.

[32] "After *Thomas*, it would not offend the Constitution if an Article I court determined private rights if such rights were 'closely integrated into a public regulatory scheme' over which the Article I tribunal had been assigned jurisdiction by Congress." *Smith v. Derwinski*, 1 Vet.App. 267, 273 (1991) (quoting *Thomas*, 473 U.S. at 586).

[33] *Ante* at 6-7.

President's power to appoint and remove commissioners, including Article III judges, posed a "negligible threat to judicial independence"—because judges could only be stripped of their status on the Commission and Congress had safeguarded the independence of the Commission from executive control by specifying that the President could remove commissioners only for good cause, thereby ensuring that they would not be subject to coercion. *Id.* at 410-11; *see Battat*, 148 T.C. at 55-56 n.35. Though *Battat* did not make a branch determination, it noted that *Mistretta* held that the limited "for cause" interbranch removal power of the President was not a separation of powers problem, even for an Article I appointment within the judicial branch. *Id.*

It should be obvious that if the work of an administrative rulemaking entity such as the Sentencing Commission is sufficiently related to the work of the judicial branch to belong there, the exclusively judicial review by this Court is, too. It is equally clear that the Sentencing Commission, magistrate judges, bankruptcy judges, this Court, and the Article III courts are not equivalent entities. But that fact is not against or beside the point, as my concurring colleague seems to argue. It *is* the point—being an Article III judge is not a prerequisite for judiciary branch membership. And the comparison to the Sentencing Commission highlights emphatically that this Court's work is far from "incongruous or inappropriate" to the judicial branch. *Mistretta*, 488 U.S. at 396. The interdependence that Madison and the *Mistretta* Court saw is not an elitist, insular judicial branch, but one encompassing judges and some non-judges that "share the common purpose of providing for the fair and efficient fulfillment of [the judiciary's] responsibilities." *Id.* at 389. The choice by Congress to create this Court to provide independent judicial review most assuredly does not diminish the likelihood of impartial decisionmaking, free from political influence; Congress's choice increases that likelihood exponentially, and that choice does not encroach on the judicial powers of Article III courts, it augments them. Congress may confer on an Article I court the power to decide federal cases and controversies over public rights such as veterans' benefits, *see Wellness*, 575 U.S. at 689-90, and has done so. That action does not render the Court an executive agency. The "scholarly support" my concurring colleague has mustered unwittingly solves the puzzle in a way that contradicts his (and the cited author's) premise:

> What makes applying law to facts an exercise of the judicial power is the nature and purpose of that application.. . . .If it is done by an executive agency to guide its actions, it is not an exercise of the judicial power. If, however, it is done for opposing parties by a neutral with the purpose of authoritatively pronouncing the law in officially resolving a dispute between these opponents, then it is an exercise of the judicial power.

Craig A. Stern, *What's A Constitution Among Friends?—Unbalancing Article III*, 146 U. PA. L. REV. 1043, 1052-53 (1998). As the Supreme Court called it in *Freytag*, the Court exercises the judicial power of the United States under Article I (rather than Article III).

Reconciliation of the Supreme Court case variations should yield a principled line that places this Court in the judicial branch, for it is not an agency entity using court-like procedures but fully a federal court exercising a portion of the judicial power of the United States by providing independent judicial review of agency decisions regarding claims for veterans benefits.

Conclusion

In sum, the petitioner has not met the standards for either extraordinary relief or recall of mandate, as the Court's opinion covers. Since *Arthrex*, the U.S. Court of Appeals for the Federal Circuit has declined to address the question my concurring colleague would resolve—whether the manner in which Board members are appointed violates the Appointments Clause—because the plaintiff, like Mr. Prewitt, "ha[d] not addressed the substantial degree of supervision and control exercised by the Board over the assignments and decisions of the Board's administrative judges." *Rodriguez v. Dep't of Veterans Affs.*, 8 F.4th 1290, 1308 (Fed. Cir. 2021). However, if "our rejection of the veteran's construed motion to recall mandate warrants a fuller explanation" and "requires us to consider this Court's place in the Constitution's structure,"[34] I would deny the petition because, though the Court is a judicial body wielding the judicial power of the United States pursuant to Article I and not an executive agency supervising the Board, the Board has meaningful supervision by the Secretary and the Chairman of the Board, who are accountable to the President. *See Rodriguez*, 8 F.4th at 1308. If yet clearer accountability is deemed necessary, the determination of how to address any deficiency should be made by legislative enactment or executive regulation that is mindful of the Supreme Court's remedy in *Arthrex*—declaring the statute at issue unconstitutional to the extent that it precluded the patent board's director from reversing the decisions of administrative patent judges, 141 S. Ct. at 1986-87—and the current requirement that impartial Board members render "just and speedy decisions" in accordance with applicable statutes, regulations, and precedent opinions of VA's General Counsel. *See* 38 C.F.R. §§ 20.1(b) (2022) (the Board's rules of practice "are to be construed to secure a just and speedy decision in every appeal"); 20.105 (2022) ("criteria governing disposition of appeals"); 20.107 (providing for disqualification of a Board member if there are "circumstances which might give the impression of bias either for or against the appellant."). The answer is not to reimagine this Court by ignoring or discarding its creation, structure, and function. The statutes and regulations that reflect the establishment of this Court and govern its independent judicial review are not, as my colleague hints, mere trappings like a powdered wig or a black robe to make agency adjudication seem judicial.

Acknowledging that the Court belongs in the judiciary is not an encroachment that undermines the separation of powers principle, diminishes the purity or institutional integrity of the judicial branch, or threatens the life tenure of Article III judges. Article III's tenure and salary protections exalt and protect the federal judges imbued with the broadest possible substantive jurisdiction. Though "Congress could choose to rest the full share of the Judiciary's labor on the shoulders of Article III judges," *Wellness*, 575 U.S. at 680, Congress has acted under Article I to supplement district courts with magistrate and bankruptcy judges and establish specialized federal courts to exercise judicial power over cases involving public rights. Our constitutional creation story is the same as that of the federal circuit courts and district courts—by Congress, under Article I—except we were created nearly 200 years later and our creation does not confer Article III's tenure and salary protection. Proper consideration of this Court's place in the judicial hierarchy recognizes that it is an inferior court that was created to provide, and actually provides, independent judicial review[35] by Article I judges with statutory tenure and salary protections that

---

[34] *Ante* at 4.

[35] Moreover, the independent judicial review this Court provides is itself reviewable only by Article III's U.S. Court of Appeals for the Federal Circuit and the U.S. Supreme Court, and not by or with executive supervision or

approach those for Article III judges. And the difference in such protections is neither corrosive nor branch determinative, but tolerable for a narrower class of cases that warrant special attention. It is the assertion that judges wield executive power, and vice versa, that is the affront to separation of powers.

The complexity and supreme importance of this issue emphasize that it should not have been reached in the context of this petition, but my colleague's concurrence could not go unaddressed. His placement of the Court in the executive branch, exercising executive power—or "a form of administrative 'judicial power'"[36]—would undercut, even nullify, the congressional compromise that overcame two centuries of not-so-splendid isolation to provide those whose service and sacrifice established and have sustained our nation—veterans and their dependents and survivors—the basic protection of review of agency decisions in the independent judicial branch. And my colleague's assessment that such placement would have no practical effect fails to appreciate the apprehension that such internal review is not impartial. Keeping the judiciary judicial honors, promotes, protects, and advances our common and most critical attributes, such as the importance of independent judicial review.

control.

[36] *Ante* at 8.